Staples, J.
I do not concur in the opinion just delivered. I do not concur either in the reasoning or the conclusions to which a majority of the court have arrived. It is not my intention, however, to attempt any elaborate discussion of the questions arising in this case. Eegarding it in all its bearings and results as by far the most important that ever engaged the attention of this court, I deem it proper and becoming to state the reasons which influence my judgment. The first point *860 to be considered is, whether the funding act is in conflict with any of the provisions of our State constitution. One of these declares that the proceeds of all public land donated by Congress for public school purposes, and of all waste and unappropriated lands, the proceeds of all escheated property, and all fines collected for offences against the State, and such other sums as the General Assembly may appropriate, shall be set apart as a permanent and perpetual literary fund. The capitation tax and an annual tax upon the property of the State, of not less than one nor more than five mills on the dollar, are also to be applied to the public free schools for the benefit of all the people of the State. It will be perceived that these provisions dedicate the proceeds of the sale of escheated and waste lands—lands donated by Congress, and all fines collected to the cause of education. How is this object to be accomplished if the funding bill creates a valid and binding obligation upon the State ? The purchasers of the lands mentioned and parties assessed with fines will have the right to discharge their indebtedness with these coupons in all cases. The same privilege will, of course, be accorded to all persons assessed with the capitation tax. That this is practically a diversion of the funds mentioned from the objects-designated in the constitution, would seem to be too clear for argument. It is said, however, the Legislature, by taxation of other subjects, may raise a revenue for the public schools equal to the amount so diverted, and thus comply with the requirements of the constitution. But how is the Legislature in any one year to-anticipate the amount that may be realized from these-sources, and then by the necessary taxation make provision for the deficiency thus created ? But if this-objection were removed, what right has the Legislature to apply in payment of the public debt a fund sacredly dedicated to the cause of education ? The difficulty is not obviated by another law raising the same amount of *861 revenue from other subjects of taxation. The Legislature is not authorized to legislate jat all in respect to the school fund, except in furtherance of the objects contemplated by the constitution. It has no right to expose this fund to any contingencies or hazards of any sort. My objection is not based upon any idea that a specific sum is set apart in the public treasury in particular coin, and noteB for the common schools which may not be touched ; hut that the Legislature cannot constitutionally provide that the school tax shall be paid in any other medium than money or its equivalent; And for the ■obvious reason that a fund is to be raised from the particular source designated, to be applied to the establishment of public free schools for the benefit of all the people of the State. These objects are effectually defeated by the funding act. Suppose the Legislature had passed an act directing that all fines, the proceeds of waste and unappropriated lands, the capitation tax and the literary fund, shall for thirty-four years be applied to ■the payment of the public debt, but at the same time providing it should be the duty of every succeeding Legislature to raise the amount thus diverted by a resort to other taxable subjects, will any lawyer or court maintain that such a law is not a palpable violation of the constitution ? Whatever form such an enactment might assume, no future Legislature would bemnder the slightest obligation to respect it. The money derived from the sources already alluded to is a trust fund, and the General Assembly is made a trustee for its inviolable application to the promotion of the cause of education; and that body is as absolutely prohibited from appropriating it to any other purpose as any other trustee is restrained from applying a trust fund to his individual debts. It is said that the obligation to pay the public debt is- as strong and sacred under the constitution as that of providing for the support of the common schools. That may be so, still it does not follow that revenues, *862 dedicated by the constitution to one 'Object exclusively* can be applied to the other.
The constitution of Iowa contains a provision that certain designated funds, and such other means as the Legislature may provide, shall be inviolably appropriated ■to the support of common schools throughout the State. The Supreme court of that State, in construing that provision, decided “that whenever the Legislature raises-a ■fund, by taxation or otherwise, for the support of common schools, it cannot, by any contemporaneous or subsequent legislation, divert the fund to a different purpose.” City of Dubuque v. County Judge of Dubuque County, 13 Iowa R. 250. In Crosby v. Lyon, 37 Cal. R. 240, the Supreme court says: The Legislature .provided that the board of supervisors shall have power to levy a tax not to exceed a specific sum, for the support of common schools in their respective counties, and by force of the constitutional provision in question, the money, when collected, becomes inviolably appropriated -to school purposes. It would hardly be considered a valid answer to these objections to say, that as the identical bank notes received were not appropriated, it was -competent for the Legislature to devote the money to -other objects, and supply the deficiency by a resort to other objects of taxation. The language of our constitution is much stronger. The tax must be imposed and collected, and when collected, must be appropriated in the specific way designated. The practical operation of the funding bill is to defeat these objects, to divert the •fund before it reaches the treasury, and apply it to the payment of the public debt, in plain contravention of tbe express language of the .constitution.
These are some of iny objections to the funding bill, as affected by the constitution of Virginia. It can hardly be necessary to adduce argument or authority to show that no valid contract can be founded on a law which violates the constitution of a State. No binding obli *863 gallon can result from such a law. It confers no legal right on the one party and imposes no corresponding legal duty on the other. Its repeal can, therefore, in no manner impair the obligation of a contract.
Conceding, however, the constitutionality of the funding act, I propose to consider the question of the power of the Legislature to repeal it.
The interest upon the public debt is estimated in round numbers at two millions of dollars annually. To meet this sum, coupons will be issued and used, to a large extent each year, in the payment of the public dues. To what extent they will be so used, it is impossible, in the nature of 'things, even to anticipate. The Legislature must, therefore, impose annually, a tax sufficient to ■pay the entire interest. It must also lay a tax’Sufficient to defray the ordinary expenses of government and to carry on the system of public schools provided for in the constitution. It is, therefore, clear, whatever else may happen, provision must be made for the creditors of the State, or the government will fall to pieces for the want of means to sustain it. It is substantially, and in its practical effects, an appropriation by the Legislature of 1870-71 of the public revenues to the amount of two millions of dollars each year for the next thirty-four years, and probably longer. It is claimed that the act imposing this obligation constitutes an inviolable contract, which this court, may compel the Legislature -to ■ perform. In support of this, as it seems to me, alarming and extraordinary doctrine, certain cases decided by th’e Supreme court of the United States are much relied on. I do not mean to discuss the question, whether in construing our own, constitution and laws we are bound to follow, with blind submission, the decisions of the Supreme court of the United States, however erroneous and unjust we may consider them.
This may be said, however, our own books contain the report of a celebrated case, in. which this court unani *864 mous^ refuse(i not only to obey, but even enter upofiits records, a decision of the Supreme court of the United States, notwithstanding the case involved the validity of a treaty, and an appeal had been taken under the twenty-fifth section of the judiciary act, from the judgment of court t° the Supreme court of the United States, These are, however, old fashioned doctrines, and have now ^ut few avowed supporters anywhere. Every day’s history but teaches the melancholy lesson that the Federal courts, the Federal Legislature and executive will, in the end, absorb every vestige of the rights of the •States.
The cases of Woodruff v. Trapnall, 10 How. U. S. R. 190, and Furman v. Nichol, 8 Wall. 224, are those principally relied on here. They present substantially the ■same points, and I shall content myself with a brief reference to the last mentioned decision. It appeared in that case that the Bank of Tennessee was essentially a State institution. The State owned the capital and received all the profits. The Legislature, in its anxiety to increase the circulation of the notes, provided they should ■be received in payment of all public dues. The effect of this provision was to prevent the return of the notes for redemption, and thus the State was enabled to realize a -clear profit from the interest on its loans, and from the notes which were never returned for payment. In this way the State of Tennessee became, in fact, a bank, assuming all the obligations and reaping all the advantages that appertain to these corporations. In the present case, if-the State will derive any benefit from the funding bill—if that enactment is founded upon a valuable consideration—I am unable to perceive it. It is ■said that the creditor has released one-third of his debt. I do not so understand it, and I will hazard the assertion, the creditor does not so construe the law. If this was the intention of the framers of the act, they have adopted an obscure and equivocal mode of expressing a *865 plain and simple agreement. The creditor surrenders his bond and obtains a new one for two-thirds of his debt, and coupons for the interest. For’the remaining third the bond is held in trust by the State, and a certificate is given him stating that payment will be provided for in accordance with such settlement as’may be made with West Virginia. If that State is faithful to the obligations resting upon her, the creditor will receive the other third also. On the other hand, if she repudiates these obligations, there is no agreement or understanding absolving the State from the payment of such third. It is as much bound for the payment of the whole debt as before the passage of the funding bill. I am, therefore, unable to perceive that the State has derived any advantage from the creditors’ acceptance of the provisions of the funding act. The contract, if such it be, is wanting in the ‘essential element of a valuable consideration, so much relied on in the opinion of the Supreme court of the United States.
But the material distinction between the cases lies in the fact, that the notes of the Tennessee bank were entirely valueless to the holders, unless they were permitted to use them in the payment of State dues. In this case, the coupons, although they may not bejreeeivable in discharge of taxes and other demands of the State, constitute, nevertheless, a subsisting obligation as valid and binding on the State as the original bond ¡.held by the creditor. As the bondholder gave no consideration for the privilege of using the coupons in the payment of bis taxes, so he will lose nothing to which he is justly entitled by the withdrawal of that privilege He may, perhaps, lose the opportunity of speculating in these coupons ; and he will be required to pay his share or proportion of the taxes in the currency exacted from every other citizen. The State does not seek to repudiate the debt, or deny its validity, but simply postpones the pe *866 riod of payment. • If the creditor is not satisfied, he may resort, I imagine, to his original obligation, which is in nowise impaired. The Legislature of the State has often arrested for a time the collection of private debts, and however the constitutionality of such statutes may be doubted, as applied to individuals, no State can be justly chargeable with impairing the obligation of a contract because of a failure or refusal to discharge all its liabilities at the appointed day. Governments are established for the benefit of mankind. They constitute a trust created for the general good, and that general good sometimes requires the dedication of every resource to the common cause. A State, under some great and overruling necessity, may feel impelled to call to its aid every arm and every dollar in the final struggle for existence. And so in times of great pecuniary distress and embarrassment, when credit is prostrate, finances disordered and the people reduced to general bankruptcy and ruin, extraordinary measures become necessary to restore confidence and prosperity to a prostrate and languishing State. Disasters like these have occurred to us in times past, and will occur again. They come upon all people. They constitute a chapter in every history. Of the measures necessary at such periods the legislative department, and not the judicial, must be the judge. It belongs to the former, and not to the latter, to say when the public burdens shall be increased or diminished, whether the public interests demand a payment of the State'debt,'or its postponement. According to the theory and practice of our government, the, whole subject of taxation, the raising and collecting public revenue, and its appropriation, are under the exclusive control of the representatives of the people. These are sovereign powers, which no Legislature is competent to surrender; nortean it, by any contract or enactment, deprive, any future Legislature of the right to adopt any laws, to im *867 pose any burdens, and apply the public revenue in any manner the public interest may require, not prohibited by the constitution.
This court held, in Burroughs v. Peyton, 16 Gratt. 470, that the Congress of the Confederate States could not, by any agreement with a private citizen to exempt him from military duty, create an obligation which the same, or any future Congress might not disregard, if the public interest demanded it. Judge Robinson, in delivering the opinion of the court, said : “By the term contract in the constitution is not meant to include rights and interests growing out of measures of public policy. Acts in reference to such measures are to be regarded as rather in the nature of legislation, than of contract; and although rights .and interests may have been acquired under them, those rights and interests cannot be considered as violated by subsequent legislative changes which may destroy them. Whatever in the nature of a contract could be considered to exist, there must be implied in it a condition that the power is reserved to the Legislature to change the law thereafter, as the public interest may, from time to time, appear to require,” Every word that is here said applies with peculiar force to the subject of taxation. What is taxation but the tribute paid by the citizen for the protection which he receives. It is not asked, but demanded, exacted by the government to fill the public coffers, that the general welfare may be promoted and the rights and the liberties of the people protected. In particular specific instances, it may be the subject of contract, and may be surrendered by the government. And this is all that was claimed or asserted in the opinion just quoted, which was delivered by me in the case of the City of Richmond v. Richmond and Danville Railroad Co., 21 Gratt. 604. And this is as far as the courts have gone in any case—that for a consideration received, the State may exempt from taxation certain rights and franchises ; but if the exemption *868 is made as a privilege only, it may be revoked at any time. But what is the exemption of a church or an institution of learning, or even a railroad corporation, probably called into existence by an agreement for such exemption—what is all this compared with an abandonment of the power of collecting the public revenue to the amount of turn millions annually for more than a quarter of a century.
It is impossible to imagine a stronger instance of an attempt, by an irrepealable law, to diminish the powers of succeeding Legislatures in respect to the subject of taxation and the public revenue—powers inherent in all governments, and important to the well being of every organized society.
In the case of the Ohio Life Insurance and Trust Company v. Debolt, 10 How. U. S. R. 416, Chief Justice Taney, in discussing this subject, said :
“ They (the Legislature) cannot, therefore, by contract, deprive a future Legislature of the power of imposing any tax it may deem necessary for the public service, or of exercising any other act of sovereignty-confided to one legislative body, unless, indeed, the power to make such contract is conferred upon them by the constitution of the State.”
In Virginia it has been the uniform practice for each Legislature to impose the taxes necessary for the purposes of the government during the existence of such Legislature; and this attempt, thirty years in advance, to appropriate the sum of two millions yearly to a specific purpose, beyond the control of every power in the State, is believed to be without precedent in the history of this or any other State. If there be any advantage in the frequent recurrence of popular elections, it is only in the fact, that the burdens annually laid upon the people are imposed by those fresh from their midst, and familiar with their condition, wants and circumstances. An irrepealable law, therefore, imposing taxes to a large *869 amount, and dedicating the revenue thus raised to any specific object, even the payment of a public debt, would seem to be contrary to the genius and spirit of our institutions. If some future Legislature, in an hour of madness or folly, should provide that the bonds of the State should be received in payment of all public dues, we must equally bold that such legislation constitutes a valid and binding contract. This is the necessary result of the decision just made.
In Woodruff v. Trapnall, the Supreme court of the United States went so far as to hold that a defaulting collector, against whom a judgment had been rendered, had the right, even after the rendition of the judgment, to buy up the worthless notes of an insolvent bank, and with them discharge a judgment for gold. It is gratifying to know that this case was decided by a majority of one only, in a court consisting of nine judges. Mr. Justice Greer, with whom Justices Catron, Daniel and Helson concurred, delivered a very able dissenting opinion. He protested against the assumption that the Supreme court had the power to compel a State of the Union, who repudiates her debts, to pay them, upon any idea that such refusal or repudiation impaired the obligation of a contract. He protested against the decision, because under it, so long as any portion of the three millions of dollars of notes issued by the bank before 1845 remained unpaid, the State of Arkansas could not collect a dollar of taxes of citizens in lawful money. He denied that when a State published to the world its willingness to accept payment of its notes in the issues of a bank, it amounted to a contract by implication, with the public and each individual comprising it, to guarantee the notes held by said banks; that this contract was with and is attached to said notes in the hands of the bearer, provided the notes were issued before such offer was withdrawn. How, whether the majority or minority of the court was right—with such *870 a division—the case, if it were analogous in all respects to the present, could not be regarded as binding authority, or even a precedent, in any other than a Federal court. It is true that the subsequent decision was made by a unanimous court; but in the meantime Judges Catron and Daniel had left the bench, and we are to presume that the other dissenting judges had not abandoned their long entertained and most deliberate convictions, but simply acquiesced in the decision of a majority. However this may be, I do not consider either of the cases as involving the questions arising in this, and .with the greatest possible respect for my brethren, I do hot believe the Supreme court of the United States will ever hold that one Legislature can, by any form of enactment, bind succeeding Legislatures and the public revenue in the manner attempted in the provisions of the funding act; and until they so decide I am not willing that this court should sanction a precedent which may prove most disastrous to all the vital interests of the State, and under authority of which,' practically, liens and mortgages may be given upon the future revenues of the State by statutes assuming the form of contracts. Ve have heard a good deal of violated faith, and of the obligation and duty of paying the public debt. These are questions for the consideration of the Legislature, and not of the courts. They who purchased the bonds of the State were well aware of this when they made their investments. They who deliberately, and in defiance of a positive enactment of the Legislature that these coupons will not be received in payment of public dues, persist in purchasing them, are not entitled to the least favor or consideration, and should receive none from the court.
Upon this question of public faith I will say this : that for four years Virginia bore upon her bosom the burden of a civil conflict as great as any recorded in history. She came out of the struggle presenting a lamentable *871 spectacle of a prostrate and bleeding State, without a currency, without any organized system of labor, one-half of her territory almost a waste, and vast numbers of her citizens .reduced to hopeless insolvency and ruin. For years after the rage of battle had ceased she was kept in subjection to military power, under the rule of aliens and strangers, unacquainted with her laws, her traditions and her sufferings—and yet her statutes ex-Mbit the gratifying spectacle of an honest endeavor on the part of her representatives, while still under the shadow of these great disasters, to make some provision for the payment of her creditors. I believe it will still be done, and payment be made from time to time until the last farthing is paid. But regarding the whole subject as involving the exercise of legislative functions of sovereign powers, I am content to leave it where it properly belongs, under our constitution and form of government. Virginia’s representatives will not fail to preserve untarnished Virginia’s honor.
After the decision of the court was announced, the attorney-general moved the court for a rehearing of the case. This question was, according to the practice of the court, submitted to the judges who had concurred in the decision.
Anderson J.
When the decision of the court in these causes was announced a few days ago, I briefly stated orally the grounds of my opinion. And as they are brought before us again, on the petition of the attorney-general, for a rehearing, I deem it proper to state the reasons which have conducted me to the conclusion to which I have arrived.
It is the practice of this court to grant a rehearing if any one of the judges who united in the decision is in doubt as to its correctness. And considering the importance which has been attached to this decision, and *872 that the motion is on behalf of the Commonwealth, I should be disposed to favor a rehearing if I could see any ■ground to doubt the correctness of the decision, or the slightest probability that it would be changed upon a re-argument. But that not being the case, it would be worse than an unprofitable consumption of time to keep the public mind in suspense as to the final decision.
The whole case is.embraced in this one inquiry, did the State contract, in the sense in which the word is used, in both the Federal and State constitutions, to receive these coupons from the holders thereof in payment of taxes or other dues to the Commonwealth ? If so, the act of 1872 in question annuh a contract, and consequently impairs its obligation, and falls within the prohibition of the Federal constitution, art. I., section 10, which declares that no State shall “ pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts and of the Virginia constitution, article V., section 14, which declares that “the General Assembly shall not pass any bill of ¡'attainder or any ex post facto law, or any law impairing the obligation of contracts,” &c.
That a State may make a contract with an individual, which is binding on the State, will hardly be questioned by any one whose opinions are entitled to respect, or who has any self-respect. And that a State law impairing the obligation of such a contract is unconstitutional, is no longer an open question. If any doctrine of law can be said to be settled, this has been since Fletcher v. Peck, 6 Cranch, R. 87, 187, decided in 1810, upon the unanswerable reasoning of C. J. Marshall, and which afterwards, in the case of Stale of New Jersey v. Wilson, 7 Cranch, R. 164, was recognized, and by all the courts since, State and Federal, as far as I am informed, as the settled doctrine on that subject.
But it is said that one Legislature cannot bind a future Legislature. That is not fairly the question here. It *873 does not fully present the case made by this record. The question rather is this : When a contract is made by the State with an individual, by authority of the supreme legislative power of the Commonwealth, can a subsequent General Assembly annul it ? I hold that it cannot. If it w7as such a contract as the Legislature had . . the power to make, or to authorize to be made, it is binding upon all subsequent General Assemblies, just as it is binding on the other departments of the government The question is then reduced to this, had the General Assembly of 1871 power to authorize, on the part of the State, the contracts in question to be made ?
The argument that the contracts are not binding, because not for valuable consideration, can hardly require an answer. The plainest understanding will comprehend that if I owe you a debt, upon which interest has accumulated, which I have not been prepared to pay, and I give you a new bond for the principal and accrued interest, and you surrender my old bond, it is a contract for valuable consideration. And not only that, but the consideration is sufficient to support a deed of trust on property, to secure its payment, Exchange Bank for, &c., v. Knox & al., 19 Gratt. 739, 747 ; citing 13 Gratt. 427 and 15 Gratt. 153. If the receivability provision be re-regarded as security for payment, the pre-existing debt was sufficient consideration.
It matters not whether the State is released from one-third of the debt or not; if the new bond had been given for the whole of the debt, it would have been a valid obligation for a valuable consideration. Whether the State is released or not for one-third of the debt, it is very clear that in this^transaction she has only assumed to pay two-thirds of it. And I could not say that she is bound for any more. That question, though one of great interest to the State, is not involved in this case. Because, however, it may be decided the obligations assumed by the State are for valuable consideration.
*874 The release of the State from a part of the old debt may, and does, affect the question, whether the contract was very beneficial to the State or not, but cannot affect the question whether the contract was valid or not. A contract may be for valuable consideration, and binding, although it may not be beneficial to the party ; else the binding obligation of a contract would depend upon whether the contractor had made a good bargain or not, which is an absurdity. Whether the contracts made on behalf of the government with the public creditors were beneficial to the State, is a question about which men differ in opinion. It is not a question for the courts. When they are called upon to expound and enforce contracts, if the contract was fair and for a valuable consideration, it is not for them to inquire whether it was a good bargain or not for either party.
But it tis argued that the Legislature had no power, under the constitution, to authorize a contract to be made binding the State to receive the interest coupons when due in payment of taxes, &e., upon the ground—IVst, that it is incompatible with other obligations imposed upon the Legislature by the constitution of the State. And in support thereof, it is said those provisions of the constitution which set apart certain funds, and a certain proportion of the tax for the public schools, would be defeated by this legislation. It would seem to be a sufficient reply to say, that if it were impracticable to 'raise a sufficient revenue for both purposes, the latter did not impose an obligation on the Legislature paramount to the obligation to provide for the payment of the interest on the public debt. That was an obligation antecedent and paramount to the constitution itself, and could not be repudiated by the constitution, if it bad so provided. But it is not repudiated nor ignored ; but the obligation is clearly recognized by sections 7, 8, 19 and 20 of article 10—at least-to pay Virginia’s proportion. And, furthermore, this being an obligation of debt, and *875 not eleemosynary in its character, as are the other provisions referred to, however desirable and important it may be, that they should be carried out, I hesitate not to say, this is of higher obligation. A man must be just before he can be generous.
But there need be no clashing of duties here. It is only required that the Legislature should levy a tax sufficient for both objects ; a duty imposed on .it by the constitution. It has not been the practice to set apart in the public treasury the identical money received for the public schools; nor is it required by the constitution, or act of Assembly. And the Legislature has discharged its constitutional obligation when it has set apart the required amount for that purpose.
But secondly, it is urged that the whole subject of taxation, the raising and collecting the public revenue, and its appropriation, is under the exclusive control of the representatives of the people, and that it is a power which cannot be surrendered. That principle will not be questioned; but to give validity and effect to the coupon provision of the act of 1871 does not in any sense, or in any respect, conflict with that principle. For it was the act of the representatives of the people. It was the act of a legislative assembly clothed with precisely the same powers with which the present General Assembly is vested. Indeed, it is the same legislative department of power in the government," though the persons delegated by the people to its exercise are not identical. Neither Assembly is superior to the other; and the acts of one, within the limitation of its powers by the State and Federal constitutions, are entitled to the same respect that the acts of the other are, and have the same binding fcrce. A subsequent Assembly may, indeed, repeal the acts of a preceding, not because it is superior, but because it is equal, in legislative power. But the repeal, where rights have vested, can only operate prospectively. When it undertakes to annul and in *876 validate rights which have vested under the previous act, which was enacted within the scope of the powers of the Assembly, it claims a superiority, and invades the rights of individuals which are guaranteed by the constitution.
A majority of this court, in Griffin v. Cunningham, 20 Gratt. 31, went very far in the expression of their sacred regard for this doctrine of vested rights, when they held that decrees of certain persons, who had been detailed or appointed by a military commander, to fill the office of judges of the Supreme court of Appeals of Virginia, during the military rule, and which were pronounced, after whatever of authority they had under the military appointment bad ceased, against the protestation of at least one of the parties who complained, could not be reviewed by this court, because rights had been vested by the said decrees. And that an act of the Legislature which expressly authorized this court to review them, upon the petition of any party who felt himself aggrieved, was unconstitutional. J. Staples, in delivering his opinion, said: “The parties interested in them (the decrees) acquired thereby vested rights, of which they -cannot be divested by special enactments of a retrospective character.” Two of the judges held that the pretended decrees vested no rights, and that the law was constitutional.
In the case of the Bank of the Old Dominion v. McVeigh, 20 Gratt. 457, the court held that an act of the Legislature was unconstitutional, which authorized payment of a debt contracted to be made to the President and Directors of the mother bank, by a citizen of the Confederate States, to be made to the branch bank, when the place of business and the directory of the mother bank were within the enemy’s lines, because it impaired the obligation of contract. In dissenting from that decision I did not controvert the principle, that if the law violated a contract between the State and the bank, or between the bank and its debtor, it was unconstitutional *877 and void. But I held that it did not violate the contract between the State and the banks, because the Legislature had reserved, in the act of incorporation, which was the contract with the banks, the right to alter and amend the charter; and under that reservation had the right to change the name and domicil of the bank, and the organ through which the body corporate might act and speak; and that it did not impair the obligation of the contract between the bank and its debtor, because the debt w7as not due to the President and Directors of the mother bank propriis personis, but was due the body corporate, and that a payment to the new agency was as much a payment to the creditor as payment to the old, who were not within the jurisdiction of the State, while the corporation was, and therefore was no violation of contract between the bank and its debtor.
It is true, that government may, in the exercise of the right of eminent domain, divest individuals of their rights of property, which public necessity requires should be appropriated to public uses. But it is equally the settled law, that government cannot exercise this power without compensating the individual for the fair value of his property. This principle of eminent domain can, therefore, have no application to the questions involved in these causes.
But the doctrine that one legislative Assembly cannot invest rights which a subsequent Assembly may not divest, which has recently been promulgated, can find no warrant in reason or authority, and leads to the most pernicious consequences. If the Legislature may enact laws divesting you of your rights of property in contracts and personal securities, it may divest you of your title to your lands; for the bondholder is as much entitled to his bond as to his land. And as all our titles to real estate are mediately or immediately vested by acts of legislation, and as no time runs against the Commonwealth, if that doctrine be true the tenure by *878 which we hold our lands is the will of the Legislature. so may be gaa(j -with regard to the rights and franchises which have been invested in all our railroad, manufacturing, and industrial and financial associations. Such a doctrine would doubtless be pleasing to those who hold that all private estates should be divested, and an equal division made amongst the people, ‘e without distinction of color”—that it is against natural right that one man should have more of this world’s goods than another. It is the principle of the freebooter and the highwayman, and can find no toleration within the sacred precincts of law and justice.
Thirdly, It is objected, that no rights vested by virtue of the contract on the part of the State, to receive thq coupons in payment of taxes and public dues, because the General Assembly had no power to appropriate a part of the revenues of the State for a period of thirty-four years, for the payment of interest on the public debt in a way to bind future Legislatures. Is this so ? Cannot one General Assembly make an appropriation of future revenues of the State, so as to vest in parties the right to the appropriation in such manner that it cannot be divested by a subsequent General Assembly ?
The power to appropriate, as well as the power of taxation, is a legislative function.
Indeed, it is claimed by those who sustain the act of 1872 that they are sovereign legislative powers, which cannot be surrendered by the Legislature. By article V., section 1, of the constitution of Virginia, the legislative power of the Commonwealth is vested in the General Assembly. Consequently the Assembly which enacted the act of 1871 in question, was, during the term of its existence, fully invested with the whole legislative power of the State, and could appropriate the revenues, or such part of the revenues as was necessary to meet the annual legitimate liabilities of the State, as long as those liabilities existed, unless its powers in this *879 respect are limited by the State or Federal constitutions. For it is an established principle that the State Legislatures are invested with all legislative powers which are not prohibited by the constitution of the State or of the United States. It is not pretended that any restriction of this legislative power can be found in the Federal constitution, and it is not embraced in the limitation of the powers of the General Assembly in the State constitution.
The convention which framed our State constitution might have withheld this power from the General Assembly, and doubtless would have done so if it had so designed, because it was then no novel principle of legislation in America. By the act of the Virginia Legislature of March 18th, 1856, treasury notes were authorized to be issued, not to exceed, at any one time outstanding, $1,300,000 in principal, which, it was provided by the act, shall be received by way of setoff in liquidation of all taxes and debts due the Commonwealth after the 30th of September 1856. The issue of $1,000,000 of notes was authorized by the act of March 14th, 1861, bearing six per cent, interest; $2,000,000 by ordinance of April 30th, 1861, and $4,000,000 by the ordinance of 28th of June 1861. All these issues were made receivable in payment of taxes and dues to the Commonwealth, and a doubt was never raised, that I ever heard, as to the constitutionality of that provision. The same principal of legislation had been practiced in other States of the Union—in Michigan aS' far back as 1841, and in Tennessee as far back as 1836, and by the Congress of the United States more frequently and on a more extended scale, from 1847 down to the act of July 17th, 1865, embracing an issue of bonds, registered and coupon, and treasury notes exceeding one billion, the coupons and treasury notes of the entire issue being made receivable and payable for taxes and public dues, except import duties, &c.
*880 I think I am, then, well warranted in saying that this was no novel principle of legislation when the constitution of Virginia was framed; and I infer from the fact that there is no limitation in the constitution of the powers of the General Assembly in this respect, that no limitation was intended.
But this power is recognized, in the constitution, and the General Assembly is expressly required to appropriate a part of the revenue in advance for the extinguishment of the principal of the debt. Section eight of article X. of the constitution is in these words: “The General Assembly shall provide by law a sinking fund, to be applied solely to the payment of the principal of the State debt, which sinking fund shall be continued until the extinguishment of such State debt; and every law hereafter enacted by the General Assembly, creating a debt or authorizing a loan, shall provide a sinking fund for the payment of the same.” This provision of the constitution does not invest the power iu the General Assembly to appropriate a part of the annual revenues of the State in advance, but imposes the obligation on it to exercise the recognized power with which it was invested for the purpose indicated in the way prescribed. And now7, if it is a legislative function of the General Assembly to create a sinking fund, by an appropriation of a part of the revenue, thirty-four years in advance, to extinguish the principal of the public debt at its maturity, which appropriation cannot be disturbed or diverted from its object by subsequent General Assemblies, it would follow that to make an appropriation in advance for the payment of the interest of the public debt, is not contrary to the legislative function. And being stipulated for in this case, and made a part of the contract, its repeal by a subsequent General Assembly would fall within the prohibitory clauses'of both the Federal and State constitutions above recited.
But fourthly, it is objected that the provision in the *881 act of 1871, obligating the Commonwealth to receive the interest coupons in payment of taxes and public dues, is a surrender or abdication of a power which, in future legislation, may be necessary to carry on the government, and incapacitates the Legislature to discharge important constitutional duties in future, and is, therefore, unconstitutional and void.
That the Legislature cannot enact a law which will disable and make it impossible for it to discharge important duties to the country, which the constitution devolves upon it, is a principle which I will not controvert. And this is the whole of Burroughs v. Peyton, 16 Gratt. 470, as far as it bears the remotest analogy to any question raised upon this record. In that case it was held to be the constitutional duty of Congress to provide for the common defence, and to call into the military service of the country every able-bodied citizen, if needed for the public defence, and that it was a power which Congress could not abdicate. And it was held that if the act of Congress could be construed to authorize, without limitation, able-bodied citizens to be released by contract for' ever afterwards from the obligation of rendering military service for the country, the act was unconstitutional, as it would, if carried into execution, divest Congress of the power to discharge an important duty essential to the public defence, which had been confided to it by the constitution, and the contract was void.
And it is now argued that, inasmuch as it is the constitutional duty of the Legislature to levy taxes and raise a revenue necessary to carry on the government and to fulfil its obligations—which it cannot fail to do without violating its constitutional duty—that an act, whether by the same Assembly or a previous one, which would deprive it of the power to discharge that constitutional duty, would be unconstitutional and void. What we have to consider, then, is, Is such the nature and effect of the coupon provision in the act of 1871?
*882 The presumption is in favor of the constitutionality of a law,'and that the Legislature did not intend to enact a law which would in future incapacitate it to discharge its important legislative functions and constitutional duty. That was a matter which it concerned the Legislature to ascertain before they authorized the contract to be made. It was purely a legislative enquiry. It would not be meet or seemly in-the judicial tribunals to go into extrinsic evidence of fact as to the operation of an act of the Legislature, to show that the act was unconstitutional. And when they enter upon such an enquiry they enter a field which is foreign to their jurisdiction. They invade the territory of another department of the government.
I would not say, however, that in no case would it be competent for the judicial tribunal to declare a law tobe unconstitutional upon this ground. Such a case might be supposed. Lor example, if the Legislature should enact a law for ever exempting the property, real and personal, of all the people of the State from taxation, who should claim the benefit of the exemption within a limited time, I am not prepared to say that such an act would not be unconstitutional. But if the judicial authority could interpose to annul a law enacted by the Legislature, upon the ground that it incapacitated it in future to discharge its important constitutional duties, it could only be in an extreme case, and where it was palpable on the face of the law, that such was intrinsically its nature, and that such must be its effect and operation.
It does not palpably appear from the intrinsic character of the act of 1871, of otherwise, that its provisions in relation to the receivability of the coupons amount to a surrender or abdication of any important power of the Legislature, or that it disables the Legislature now, or in future, to fulfil its constitutional obligation to raise a sufficient revenue to pay the interest on the public *883 debt and carry on the government. It in fact only provides that the Legislature will do that which it is its constitutional duty to do, to levy a revenue sufficient to pay the interest on the public debt, and to carry on the government. To argue that an act which requires the Legislature to fulfil its constitutional duty is an abdication, or that it incapacitates it to do its constitutional duty, is a fallacy and a contradiction.
And the method which it adopts to secure it is not novel, as we have seen ; nor is it an “ ingenious contrivance” in any improper sense. It only authorizes the application of the equitable principle of setoff in such cases. And why is it not as equitable and just to apply this principle of setoff’ against the government as against individuals ? Why should I not have the same right to setoff against a demand of the government against me, a just claim which I hold agaiust the government, as I would have against an individual ? It is said “governments are established for the benefit of mankind.” They should be, and not to trample on the rights of mankind. To be a benefit to mankind, they should act with the utmost good faith and integrity in all cases. They ought not to observe with less fidelity and integrity their contracts with individuals than they exact from them in their dealings with one another. In the United States v. Mann, 2 Brock. R. p. 9, which was a case of setoff against a demand of the United States, C. J. Marshall said : “ The clearest principles of equity and law require that it (the setoff) should not be rejected ; and if the court be permitted to take jurisdiction of the subject, it cannot be disregarded without disregarding also the soundest principles of law.” The setoff' was allowed against the United States demand.
Doubtless the General Assembly which enacted the law allowing the application of this principle -believed they were making a judicious and beneficial arrangement for the Commonwealth ; and that the resources of *884 the State' were sufficient to fulfil the engagements authorized to be made with the public creditors in good faith, and to carry on the government. A majority of the succeeding General Assembly, if not of a different opinion, believe it Will be onerous on the people of the State to comply with the terms of those contracts, and at the same time to raise a revenue sufficient for the other purposes of the Commonwealth, which may be, in ¿heir opinion, of more importance or more beneficial to the State than paying the interest on the public debt, whilst a respectable minority believe that there is no incapacity on the part of the State to pay the interest on the public debt in fulfilment of the contract, and to carry on the government; aud that to do so will not require any considerable increase of taxes. Which opinion is most correct is not a question for the court. But it is our province to say that the State cannot be relieved from the obligation of a contract any more than an individual can, because it is onerous.
We deeply sympathize with our fellow-citizens in the burdens which have been thrown upon us as the result of the war, and the policy of the general government towards us since the war, which we have suffered in common with them. Mo people perhaps ever deserved better, and fared worse, than the people of "Virginia. But the courage, firmness and fidelity to principle, with which they have borne the ravages of war, and none the less nobly the disasters consequent upon final defeat has attracted to them the admiration of all noble and generous minds ; and I cannot believe that this same people would, for the sake of a few cents additional taxes upon the one hundred dollars value of property, be willing to repudiate their contract. I have no thought that a virtue which has been tried in the crucible of severest affliction, without faltering, will yield to so slight a pressure. It seems to be conceded by the action of the Legislature that the revenues arising from the present rate of taxa-• *885 tion will be sufficient to meet all the other engagements and current expenses of the State, and pay four per cent. interest on the public debt, as adjusted by the act of 1871. To enable her then fully to redeem the pledge she gave to her creditors who accepted the adjustment proposed, would require an increase of but sixteen cents on r u the $100 value of property, without resorting to other sources of taxation. I am not to be told that this great State, with such a population as she has, invested with a landed and personal property, actually assessed to be worth three hundred and seventy-five millions of dollars, which is probably at least a third less than its real value, is incapable of fulfilling the solemn contract which it made with its creditors through its Legislature. And the promulgation of such an idea would be ruinous to the public credit.
There is nothing then in the nature of the act itself, or in the circumstances of the country, to show that it is unconstitutional. But the constitutionality of such legislation has been settled, as far as it can be, by the Supreme court of the United States, in two cases, Woodruff v. Trapnall, 10 How. U. S. R. 190, and Furman v. Nichol, 8 Wall. U. S. R. 44. The former case was decided by a majority of only one. And I am free to say that there is much in the circumstances of that case, whilst I regard the principle as sound, which would cause me to doubt the correctness of the decision. But in the recent case of Exchange Bank v. Knox, 19 Gratt. 739, decided by this court,.in which I did not sit, the principle decided in the above case was approved. And in Furman v. Nichol it was unanimously reaffirmed by the Supreme court of the United States.
In cases involving the construction of the constitution and laws of the United States, it seems now to be generally conceded that the decisions of the Supreme court are binding upon the State courts. And practically they are conclusive of the rights of the parties, whether *886 approved by the State courts or not. But I hold that ^is court is also supreme in its sphere, and is not bound follow with “blind submission” any court on earth,
From the best consideration I have been able to give subject, I have not a doubt on my mind that the decision is right. And such, I understand, is the case * with the other judges who united in that decision. What, then, should this court do? We have been told, in the petition for a rehearing, that our decision has met with great disfavor. And outside of this hall the admonition has been given, that we hold our office at the will of the Legislature, and that it is perilous to thwart it. If this be so, that which has been regarded heretofore as indispensable to the security of the citizen in the enjoyment of his civil rights of life, liberty and property—the separation of the judicial power of the State from the legislative, and an independent judiciary—is repudiated by our constitution. If we sit here to obey the behests of the Legislature, and to do its will and pleasui’e, why the mockery of having a judicial department in the State? The remarks of Judge Scott, in delivering his opinion in Bouldin’s case, 6 Leigh, 639, in 1836, ai’e appropriate to this occasion, some extracts from which I hope will not be considered out of place here.
Speaking of the convention of 1829-30-—perhaps the most distinguished body of men that ever assembled on this continent, of which he was a distinguished member, he says: “No member of that body appreciated more highly than I did the inestimable value of an independent judiciary; none felt more intensely the thrilling appeal of the late Chief Justice (John Marshall, clarum ei venerabile nomen), in which he deprecated £ an ignorant, a corrupt, or a dependant judiciary, as the greatest scourge an angry Heaven ever inflicted upon an ungrateful and sinning people,’ and implored us not to £draw down this curse upon Virginia.”’ Again he *887 says: “The courts of justice are the guardians of the dearest rights of man in a social state. To them is assigned the ta°sk of ascertaining and enforcing the rights and redressing the wrongs of every member of the community. It is there the ignorant find relief from the arts and frauds of the crafty and designing; it is there alone that wealth and poverty may contend on equal terms; it is there that the weak find refuge from the strong. They are formidable only to the guilty. It is not by laws alone, but by an enlightened, honest and fearless administration of justice, that every man may sit under his own fig tree, aud there is none to make him afraid. What will be the condition of the poor and unfriended suitor ? Who can resist a powerful and popular adversary ? What chance for him who is marked out as a victim by government, if the judge stands in awe of political power? If ever those who lead and direct public opinion, not satisfied with victories in their appropriate field, shall wage war upon the courts, I trust the people will come to the rescue, and not realize the fable of the wolves and the sheep.”
I am opposed to a rehearing.
The rehearing repused.
Mandamus awarded in the first case, and in the second judgment affirmed.