Christian, J.
This case is before us, upon a petition filed by James Clarke, invoking the original jurisdiction of this court for a writ of habeas corpus. The petition and the record therewith filed show that the petitioner,. Clarke, is confined in jail under an execution (capias pro fine) issued upon a judgment of the hustings court of the city of Eichmond .for the sum of thirty dollars, the fine assessed by said court, and twenty-two dollars and five cents, the costs of prosecution on behalf of the commonwealth.
It is further shown that the petitioner tendered to James M. Tyler, sergeant of the city of Eichmond, “a ■ coupon, which was due and past maturity, for thirty dol *135 lavs, which said coupon was cut from a bond of the state of Virginia issued under the provisions of the act of assembly passed March 30, 1871, commonly known as the funding bill,” and the sum of twenty-two dollars and five cents in money, that being the amount of costs.
The city sergeant refused to receive the coupon tendered in payment of the fine imposed by the court. And thereupon Clarke applied to this court for a writ of habeas corpus, and insists upon his right to pay the fine assessed against him by the hustings court in a coupon of a bond of the state, and that upon such payment, with the costs of prosecution, he is entitled to his discharge from further imprisonment.
This record, therefore, presents for our consideration the single question, Whether a fine imposed for a violation of law can be discharged in coupons, or whether it can only be demanded and paid in money ? -
This is the same question which was elaborately argued at the January term of this court, in the case of Tyler, sergeant, v. Taylor, auditor. That case was argued upon a petition to this court for a writ of mandamus, to compel the auditor of public accounts to receive from the sergeant of the city of Richmond certain coupons which had been received by him in payment of a fine imposed on one Mayo for a criminal offence. In that case this court unanimously held that the writ of mandamus could not be issued against the auditor of public accounts because he was not the public officer whose duty it was under the I aw to receive fines collected by the city sergeant, and declaring that this court could only exercise its extraordinary jurisdiction by way of mandamus to compel a public officer to discharge a duty which the law imposed'him, and not on another; and inasmuch as the city treasurer, and not the auditor of public accounts, was the public officer whose duty it was to receive all fines collected by the city sergeant, the rule was *136 discharged and the case dismissed without deciding the question on its merits. In that case it was said, and is repeated: “ This court is always ready and willing to decide, to the best of its ability, all questions however important or difficult, or however they may affect public or private interests, which are properly brought before it, no matter how great or far-reaching may be the responsibilities it must assume in such decision. But the court is not willing, nor is it any part of its judicial functions, to decide questions outside of the case before it, and thus constitute itself a moot court to determine abstract questions.”
The question argued in the case of Tyler, sergeant, v. Taylor, auditor, did not arise upon the pleadings in the cause, and the court did not (for the reasons stated in its opinion) feel.called upon to decide an abstract question. But the same question now does arise properly upon the record in this ease, and the court is now prepared to meet the question and assume all the responsibilities which may attach to its decision, however it may affect individual or public rights, private or political questions.
But the question we have to determine (however it. is sought to be connected with questions which are the subject, unhappily, of political agitation) is purely a legal question, to he determined upon well defined legal principles, and the rules of construction universally .recognized as applicable to-the statute laxo. It all depends upon the true construction to be given to the second section of the act approved March 30, 1871, entitled an act to provide for the funding and payment of the 'public debt. This section, after declai’ing that the owners of any of the bonds, stocks or interest- certificates heretofore issued by this state * * * may fund two-thirds of the amount' of the same * * * in six per centum, coupon or registered bonds of the state, &c., &c., contains the following provision : “The bonds shall be made *137 payable to order or bearer, and the coupons to bearer, at the treasury of the state, and bonds payable to order may be exchanged for bonds payable to bearer, and registered bonds may be exchanged for coupon bonds, or vice versa, at the option of the holder. The coupons shall be payable semi-annually, and receivable at and after maturity for all taxes, debts, dues and demands due the state, -which shall be so expressed on their face.” The only question, then, we have to determine, is whether fines imposed for a violation of law, are included within the terms of the statute ? I say' this is the only question we have to determine, because the question of the constitutionality of the act above referred to, known as the funding act, has already been determined by this court. The case of Antoni v. Wright, sheriff, 22 Gratt. 833, settles this question. The same arguments against its constitutionality made in this case were urged in that. I refer to that case and adopt its principles and reasoning as a clear and conclusive exposition of the law, and am of opinion that this decision of the court declaring the constitutionality of the act of March 30, 1871, and declaring that any act of the legislature in conflict with the provisions of that act, so far as it may “ forbid the collecting officers of the state to receive in payment of taxes and other demands of the state anything else than gold or silver coin, United States treasury notes, or notes' of the national banks of the United States,” must be held to be an act “ impairing the obligation of a contract,” and therefore unconstitutional and void. This decision of Antoni v. Wright was recognized and reaffirmed in Wise Bros. v. Rogers, second auditor, and Maury & Co. v. Same, 21 Gratt. 169, and must now he held to be the settled law of this state. It is not necessary, therefore, and indeed it would be a vain and useless task, to attempt to go over again t-ie reasons which *138 governed this court in coming to the conclusions then reached, and firmly adhered to ever since. I can only for myself, that after a careful consideration of all the views which have been presented on this question, opinion of Judge Bouldin, in Antoni v. Wright, is a lucid, able and conclusive exposition of the law, is one based upon judicial logic, and fortified by judicial authority, which makes it impregnable against every assault which may he made upon it.
Adopting, therefore, the principles and reasoning in the case of Antoni v. Wright, we are left in this case to a single and very narrow enquiry, and that is, are fines imposed for a violation of law, included in the purview of the statute ?
■ One of the principal and universally adopted rules of construction of statutes, is, that in the enactment of statutes, the rule of interpretation is, in respect to the intention of the legislature, that where the language is explicit, the courts are bound to seek for the intention in the words of the act itself, and they are not at liberty to suppose or to hold that the legislature intended anything different from what their language imports. Pot. Dwaris on Statutes, p. 146. Words in a statute are never to be considered as unmeaning and surplusage, if a construction can be legitimately found which will give force .to, and preserve all the words in the act. The best rule by which to arrive at the meaning and intention of a law is, to abide by the words which the lawmaker has used. Dwaris, p. 179, note. Especially is this the case where the words used have no double or doubtful meaning, but are plain and explicit in their signification; for it is a rule of universal application that effect must be given to the words used by the legislature where there is no uncertainty or ambiguity in their meaning.
Plow, the words used in the act we are called upon to *139 construe, are as broad, explicit and comprehensive as any terms which could possibly be used. The act declares that coupons shall be receivable at and after maturity for ALL TAXES, DEBTS, DUES AND DEMANDS DUE THE STATE. Is there any uncertainty or ambiguity in these terms ? They all have a certain, definite, explicit and technical meaning. "We cannot discard any one of them as unmeaning and surplusage, but must, according to the rules of construction which bind the courts, give effect to all. We must suppose the legislature knew the ordinary meaning and legal force of the words which they.., used. If the provision of the act had been that these coupons should be receivable “ for all taxes and debts due the state,” there might be some room for doubt whether fines .were embraced; for although fines are recoverable by action of debt, and in a certain sense a fine is a debt due the state, yet it might be said with much force, if not conclusively, that the word debt refers to matters of contract, and that, therefore, a fine is not embraced in the meaning of the statute in the word debt. 13ut the words dues and demands are added. Shall we give no effect to these words of explicit meaning ? Can we take the liberty of striking these words out of the statute ? If we can, then the courts may override the powers of the legislature, and construe away any act it may pass. These words dues and demands are not uncertain and ambiguous, but have a certain, definite and explicit meaning. The word “due” is defined by Webster to be “that which is owed,” “that w'hich custom, statute or law requires to be paid;” and by Woreester, “ that which any one has a right to demand, claim or possess,” “that which can justly be required.” The word demand is a word of still larger significance, and more comprehensive meaning. Indeed, Lord Coke says, the word demand is the largest word in law, except claim. In 2 Coke upon Littleton, 291 b. he says “ demandum is a word of art, and in the understand *140 ing of the common law, is of so large an extent, as no other word in the law is, unless it be elamum, whereof maketh mention. § 445.” Webster defines “ demand,” “ the asking or seeking what is due or claimed to be due;” and Worcester, “a calling for a thing due 0r claimed to be due.” Flo words of more explicit or broader signification could have been used than these two words, “ dues and demands.” We cannot discard them, but must give them effect. Do they embrace fines ? I am bound by every rule of construction to say they do. A fine is something “ which the law requires to be paid;” and that is the meaning of the word “ dues.” A fine is a thing “due or claimed to be due” to the state, a liability which the state has a right to enforce and demand; and that is the meaning of the word “ demand.” I am, therefore, of opinion, that fines are clearly embraced within the meaning and the very words of the statute. The legislature has used words which by-their explicit, comprehensive and unmistakable meaning embrace fines, as well as taxes and debts. If after using the words “dues and demands” they had intended to exclude fines, how easy it would have been to have added the words “except fines” after the words “dues and demands.” But having used these broad and comprehensive terms, which by their common and explicit meaning embrace fines, and having used no words of exception, it follows upon every rule of construction that fines are embraced in the terms “dues and demands.” .
This construction, which would seem to be free from all doubt, if it rests upon the language of the act, is objected to upon two grounds—First. It is insisted that fines are imposed as one of the potent means of punishing offences against the law, and that the offender does not satisfy the judgment of the court if he pays an amount less than the fine assessed against him, which he does, ií he may pay in coupons instead of money, (the coupons *141 being at a discount). In answer to this view, it is sufficient to remark that the state has a right to say, and has said, in the act of her legislature under consideration, how her “ demands ” against her citizens shall be satisfied; how the liabilities “ due” to her shall be discharged. It might, with the same propriety and with equal force, be argued that debts and taxes due the commonwealth are not fully discharged by payment in coupons; and yet this is done every day under the statute law, sustained and enforced by the judgment of this court. But in point of fact, the judgment for the fine is discharged to its full extent, so far as the state is concerned, because the coupon represents the obligation of the state for the face value of the coupon offered in payment of the fine.
Second. It is objected that fines are dedicated by the constitution and by statute enacted in pursuance thereof, to the literary fund for school purposes, and if the act under consideration embraces fines, to that extent it is unconstitutional:
How, it is to be observed that neither the constitution nor any act passed in pursuance thereof, requires the collectors of the public revenues, nor the auditor, to keep separate and distinct each particular fine assessed against offenders, and pay it over as collected to the literary fund; but the requirement is, upon fair construction, to turn over to the literary fund whatever amount may come into the treasury from the source of fines, and dedicate that amount to the purpose indicated. This same argument was pressed most vigorously in the case of Antoni v. Wright (supra), and was answered, I-think, successfully and conclusively by the lamented Judge Bouldin, and I prefer to adopt his views, so clearly and ably put, rather than mar and weaken them by words or views of my own. He says: “ But it is argued that the contract in this case is void because it is repugnant to the 8th section, 8th article, and 3d section, 10th article, of the state *142 constitution, dedicating certain portions of the state revellue to the support of free schools. ¥e think there is no conflict in this case. * * * It only requires that the obligations of succeeding legislatures shall be firmly met '> that there should be what the creation of every new debt imperatively demands, to-wit: an increase of taxation if the existing rate he insufficient. The argument is based on the assumption that subsequent legislatures will fail in their duty, and pursue such a course as may result in mal-appropriation of the funds referred to; that they will decline to meet faithfully the high obligation resting on them, and then rely on the irregular consequences of their owm default as an argument against the validity of the debt for which they will have failed to provide. The mal-appropriation which -would follow would not be the legitimate result of the funding act, but in effect would be the act of the legislature failing to discharge its duty. The obligation to provide for the interest due by these coupons is as high as the duty of applying the capitation tax and other funds to the schools. Both duties are alike obligatory, and both may he discharged, as there is no conflict between them. It is only by a failure to discharge the one that the performance of the other can be put in jeopardy, and it rests with the legislature by faithfully and fearlessly meeting both obligations, to preserve the plighted faith of the state and protect her constitution from violation.”
After this opinion of the court,. delivered by Judge Bouldin, was announced, there was a motion for a rehearing submitted by the attorney-general, and the court held the case under advisement for several -weeks, anxious to correct its decision if it should appear in any respect to he erroneous, and to give to the case that calm and careful reconsideration which the gravity and importance of the questions involved required. After a candid and anxious review of the case, the court could *143 find no reason to change its opinion, but was confirmed in the justice and reasons of its conclusions. In delivering the judgment upon the motion for a rehearing, Judge Anderson, in an able and exhaustive opinion, discusses the whole question, reaffirming and enforcing the views of Judge Bouldin; and in these views the same judges concurred as in the original decision. I mention this to show with what deliberation and care the questions involved in the case of Antoni v. Wright were' considered, and the futility of again considering those questions, except to reaffirm and adopt the principles of that case, so far as they apply to the case before us.
'With respect to the argument made in that case, as it was pressed in this case, that fines and other revenues were dedicated to the school fund, and therefore cannot be paid in coupons, Judge Anderson, in his opinion (22 Graft, p. 874), says: * * * “It is said that those provisions of the constitution which set apart certain funds and a certain proportion of the tax for the public schools would be defeated by this legislation. It would seem to be a sufficient reply to say, that if it were impracticable to raise a sufficient amount of revenue for both purposes, the latter did not impose an obligation on the legislature paramount to the obligation to provide for the payment of the interest on the public debt. That was an obligation antecedent and paramount to the constitution itself, and could not be repudiated by the constitution if it had so provided. But it is not repudiated nor ignored; but the obligation is clearly recognized by sections 7, 8, 19 and 20, of Article 10, at least to pay Virginia’s proportion. And, furthermore, this being an obligation of ■debt, and not eleemosynary in its character, as are the other provisions referred to, and however desirable and important it may be that they should be carried out, I hesitate not to say this is of higher obligation. But there need be no clashing of duties here. *144 It is only required that the legislature should levy a tax sufficient for both objects; a duty imposed on it by the It has not been the practice to set apart in the public treasury the identical money received for the public schools, nor is it required by the constitution nor the acts of assembly. And the legislature has discharged its constitutional obligation when it has set apart the required amount for that purpose.”
These views, expressed both upon the first hearing and and the rehearing of the case of Antoni v. Wright, are applicable to the case before us, and must govern our decision in this case.
Much has been said in the case before us about the sacredness of the school fund, and the paramount obligation of the state to educate the people. This is a great and high obligation, and no doubt will be faithfully and firmly met by the legislature. But however great and high this obligation, it cannot and ought not to be met at the sacrifice of other obligations equally sacred,’and other duties equally high and binding. A state, like an individual, must be just before it is generous. Ho honest man can or will abstract from his creditors what is justly due them, in order to give it to his children. Ho state, in order to educate its citizens, ought to withhold from its just creditors, that which has been pledged, by its honor and plighted faith, to the payment of its just debts. Both obligations must and will be met. The people must be educated, but they must not be educated at the price of repudiation and dishonor. Better would be ignorance than enlightenment purchased at such a price.
In conclusion, I will repeat here the utterance of the unanimous voice of this court in the Homestead Cases, 22 Gratt. 301, which declared that “no state and no people can have any real and enduring prosperity, except where public faith and private faith are guarded by laws wisely administered and faithfully executed. The inviolability *145 of contracts, public and private, is the foundation of all social progress, and the corner stone of all the forms of civilized society, where an enlightened system of jurisprudence prevails. Under our system of government it has been wisely placed under the protection of the constitution of the United States, and there it rests secure against all invasion.”
It only remains for me to say that the petitioner has the right, under the law, to discharge the tine imposed upon him by the hustings court, with a coupon of a bond of the state, which the state has agreed to receive in payment of “all taxes, debts, dues and demands due the state," and that he must be discharged from further custody.
Staples, J. The opinion just delivered by Judge Christian is an affirmance of the doctrines laid down in Antoni v. Wright. It was my misfortune to dissent, not only from the decision in that ease, hut the reasoning by which it was supported. Since that time the subject has received a full and exhaustive discussion in the public press, upon the hustings and in the legislature. That discussion and my own deliberate reflections have but confirmed my convictions of the soundness and justice of the views then entertained. I do not see, however, that any good can be effected by a further discussion of the question. Every one here present—every intelligent mind in the state—has, perhaps, reached some fixed conclusion upon the subject, and nothing that can now be said by myself or others will tend to change or modify that conclusion. I will not, therefore, now undertake to enter into any discussion of those points with respect to which it was my misfortune in the former case to differ with a majority of this court. This much may be said: If it is now to be considered as the settled rule of this court that every demand, debt, claim of the common *146 wealth, of whatever character or description, to the amount of one million and two hundred thousand dollai’s annually, may be paid in these coupons;- if the legislature, under no circumstances, has for the next thirty years Power t° diminish the rate of taxation, whatever may be the condition or necessities of the people ; if, during that time, whatever may be the public exigencies, the revenues of the state are irrevocably dedicated to the creditor; if, to such an extent and for such a time' the legislature has surrendered all control of the revenues and resources of the state beyond recall, then, indeed, has the government abdicated its functions, and the state is stripped of one of its most essential attributes of sovereignty. . "W e can form some faint idea of the magnitude of the surrender and of the principle involved in it vdien we remember that under the funding bill the entire public debt might have been funded but for the subsequent legislation arresting its operation.
To all this but one answer has ever been given, and that is; it is the duty of the legislature to lay a sufficient tax each year to pay the creditor and cany on the government. To this it may also be answered, that no legislature ¡has the power to impose on succeeding legislatures such .a duty. However sti’ong the obligation of the public «debt may be, there are pei’iods in the history of eveiy state when no part of it can be paid; when the government creditor and individual creditor must consent to wait for a season; and of such periods as they arise the legislature, and not the courts, must he the judge. Instances of the kind are found in the late civil conflict between the north and the south, and in times of great financial distress and disaster, when the collection of debts is universally suspended; and others will hereafter, no ■doubt, occur when such a suspense is essential to the public safety. The amount of taxation the people can beai’— the mode and manner of imposing it—is a political ques *147 tiou to be determined by the representatives of the peopie, from time to time, as the public exigencies may re■quire.
This is the essential principle of the governments under which we live—state and federal. It is the vital element of all representative governments. In the language of the supreme court of the United States a legislative body ■cannot part with its power by any proceeding so as not to be able to continue the exercise of them. It cannot abridge its own legislative power by making permanent and irreparable contracts in reference to matters of public interest. East Hartford v. Hartford Bridge Co., 10 How. U. S. R. 511, 535; see also State Bank of Ohio v. Knoop, 10 How. U. S. R. 408; Ohio Life Ins. and Trust Comp. v. Debolt, 16 How. U. S. R. 416; Burroughs v. Peyton, 16 Graft. 470.
"With this brief discussion I am content to leave this branch of the subject, haviug already said,'perhaps, more than was necessary. It may be proper further to say that the precise question now before us did not arise and was not decided in Antoni v. Wright. It is true it was discussed both by Judge Bouldin and Judge Anderson; and while it is perhaps covered by their reasoning, it was not necessarily decided. It is, therefore, an open question.
I agree that the funding act is broad enough to include fines imposed for the violation of the penal laws; and upon that ground I thought, and still think, it violates the seventh section of the eighth article of the constitution of Virginia. That section declares: “The general assembly shall set apart as a permanent and perpetual literary fund, the present literary funds of the state, the proceeds of all public lands donated by congress for public school purposes, of all escheated property, of all waste and unappropriated lands, of all fines accruing to the state by forfeitures, of all fines collected for offences *148 committed against the state, and such other sums as the-general assembly may appropriate.”
Will it be maintained that it is competent for the legislature, by any contract made since the adoption of the present constitution, to divert the funds mentioned in this section from the objects therein designated ? Take, for example, the proceeds of the public lands dedicated by congress for school purposes. If these lands, when sold by the state, may be paid for in coupons, are the proceeds set apart for the specific purposes prescribed by the constitution ? Are they not in fact indirectly appropriated to the payment of the public debt? The same is. true with reference to fines. Instead of being “set apart as a permanent and perpetual literary fund,” aecording to the requirement of the constitution, they will be applied to the interest on the public debt. There is. no practical difference between a law which directly hands them over to the state creditors, and a law which allows them to he paid in coupons.
The answer to this again, is, that the legislature must increase the taxes, and supply the deficiency from other sources. But the question still arises, can one legislature divert a fund from the purposes of a trust under the-constitution, and rely upon another legislature to raise another fund from some other source with which to execute the trust. Suppose the succeeding legislature fails in its duty, what becomes of the constitutional requirement? The main design of the provision already cited was the creation of a fund beyond the reach of the legislature, in no wise dependent upon popular caprice for its preservation and application.
It is very true that the fines have heretofore been paid into the treasury indiscriminately with other public dues, and so long as the whole ivas paid in money no injustice or inconvenience could arise. But now the question is presented in an entirely different aspect. Tor if the *149 legislature shall pass a law, as it ought long ago to have done, carrying out this provision of the constitution and setting apart the fines for school purposes, under the present ruling of the court the act must be held unconstitutional, because the funding bill authorizes the payment of all state dues in coupons. And thus it is that an unconstitutional contract is made paramount to the constitution. One legislature, by an agreement with the public creditor, may appropriate to his claim a fund set apart by the constitution irrevocably for another purpose, and if succeeding legislatures fail to supply the deficiency from other sources, there is no remedy for the breach of trust and a palpable infraction of that instrument. I can never give my assent to these positions. It is the duty ■of the legislature, by taxation, to pay the indebtedness •of the state. It cannot for that purpose appropriate other revenues which by the constitution are placed beyond its control. Upon this point I think the argument of the attorney-general was unanswerable.
It is said, however, that the duty of the state to pay its debts is of paramount obligation to that of providing for the education of its people; and the conclusion sought •to be deduced from this is, that the constitutional provision dedicating certain funds to the cause of education, leaving the public debt unpaid, is inoperative and void.
The moi’al obligation of a state to pay its debts is not denied; but it has never been seriously contended by any •one familiar with the principles of our government, that this obligation can be enforced by law. If the people of the state do not voluntarily raise the means by taxation to pay the public creditor, there is no way of coercing them. If this be not so, the holders of the unfunded •debt will be very glad to know it, as they have not received one dollar of interest, and there is but little probability of their doing so in the present condition of .affairs. At the time of the adoption of the present con *150 stitution the state was free to appropriate its revenues to-any objects whatever. It will scarcely be contended there was anjdhing to prohibit or prevent the dedication of the funds named in the seventh section to the cause of education. That section, when adopted, became the supreme law of the land; and no legislature could by a contract with a a creditor, or by any device or contrivance whatever, evade the force and effect of the provision. The contract, if it is to be so termed, was an usurpation, so far as it attempted to appropriate the school fund to the payment of the public debt. Bor these reasons I cannot concur in the opinion just delivered.
Let me say in conclusion, however, I concur now, as-I did then, with what was said by Judge Christian in the Homestead eases; that is, “The inviolability of contracts, public and private, is the foundation of all social progress, and the corner stone of all forms of civilized society, wherever an enlightened jurisprudence prevails.” Good faith is as essential in states as in men. Neither can be just or permanently prosperous without it. Upon that subject my own voice, feeble as it is, can never have any uncertain sound. "When we speak of a contract, however, involving the public faith, such as the courts can enforce, we mean a contract sanctioned by the constitution and the principles of government under which we live. Believing that the funding hill is in violation of both, I am •for refusing the mandamus in this case.