Anderson, J.
I fully concur in the clear and able-opinion of Judge Christian in this case, but deem it proper to present some additional views in support of his-just conclusions and in vindication of my opinion in Antoni v. Wright, which was assailed in the argument of this case.
The court being unanimous in the opinion that fines are-embraced in the terms of the act of March 30, 1871, *151 which provides that coupons shall be receivable in payment of “all taxes, debts, dues and demands” of the commonwealth, 1 will confine myself to the inquiry, is said act unconstitutional so far as it requires that coupons shall be receivable in payment of fines ? It is unquestionably true, and requires no learned and elaborate citation of authorities to show it, that an act may be unconstitutional in one or more of its provisions, and constitutional in all other respects.
It is contended that the act in question is unconstitutional, so far as it authorizes the payment of fines with interest coupons, because it violates section seven of ardióle eight of the state constitution. That section is in the following language: “ The general assembly shall set apart as a permanent and perpetual literary fund the present literary funds of the state, the proceeds of all public lands donated by congress for public school purposes, of all escheated property, of all waste and unappropriated lands, of all property accruing to the state by forfeitures, and all fines collected for offences committed against the state, and such other sums as the general assembly may appropriate.” The ground of the unconstitutionality of the act as to fines as alleged, is that it is incompatible with the foregoing constitutional requirement that they shall be set apart, with the other funds designated, as a permanent and perpetual literary fund, and is a diversion of them from the purposes of the trust created by the constitution, and an application of them to other purposes. Is this so ?
The constitutional requirement is, that fines, among other things, shall be set apart by the general assembly as a permanent and perpetual literary fund. The act of assembly declares that coupons shall, after their maturity, be receivable in payment of all taxes, debts, dues and demands of the commonwealth (not excepting fines). Unless the duty imposed by the constitution and that im *152 posed by the act of assembly are so incompatible and conflicting that both ..cannot' be performed, the latter is unconstitutional for the reason alleged. If both can stand together, both may be enforced, and the act cannot sa^ be unconstitutional, because it is incompatible with, the constitutional prolusion.
The only question then is, can the general assembly comply with this requirement of the constitution, to set apart fines as a permanent and perpetual literary fund, when it has contracted with creditors of the commonwealth to receive their coupons of interest in payment of fines ?
How can they be set apart ? The constitution does not appropriate the fines to the public schools. The requirement is that they, with other things, shall be set apart as a permanent and perpetual literary fund, and by section eight, that the general assembly shall apply the annual interest to the public schools. It is evident that they must be set apart in a way which will yield an annual interest, otherwise the requirement to apply the annual interest to the public schools could not be fulfilled. And if the fines, as they were collected, were applied to the schools, they would be consumed in the use, and could not be set apart as a permanent and perpetual literary fund, from which an annual interest would arise to be applied to the schools.
For the same reason, to separate them from the other revenues by locking them up in strong boxes, whereby they could yield no interest, would not be in accordance with the design and spirit of the constitution. And moreover it would not be for the encouragement of education.
By the law, as it now stands, all moneys designed to be set apart for the “board of education,” a name sub- . stituted for the “ literary fund,” are to be paid into the public treasury upon the warrant of the second auditor. *153 And evei'y wai’rant is required to express the head of general revenue or expenditure on account of which the money is received or paid; and distinct accounts are required to he kept in the second auditor’s office of the receipts and expenditures of the board of education, the boai’d of public works, and of each of the corporations composed of officei’s of the government, of the funds and property of which the state is sole owner.
And the treasurer is required to keep separate accounts of the money belonging to the literary fund, to the fund for internal improvement, to the sinking fund, &c., showing the receipts and disbursements on account of each. (See Code of 1873, chap. 43, sections 23, 25, 26, 27, 32 and 35.)
Such was the law at the time the present constitution was being framed, and when it was adopted; such it is now, and such ithad been for many years prior to the making of the present constitution. Funds which were required to be set apart for the literary fund, and the other corporations •which were composed of officers of government, of whose funds and propei'ty the state was sole ownei’, were not required to be kept separate from each other, or from the other revenues of the commonwealth, but were required to be paid into the public treasury, the money of each fund and of the general revenues being mingled together undistinguishably. Indeed, it could not be otherwise, because all the moneys to be paid into the treasury, whether upon the warrant of the first or .second auditor, were required by law to be paid into one of the banks of the city of Kichmond (Ibid. § 7), and the bank became debtor to the commonwealth for the amount deposited. And a person bound to pay money into the treasury could not make a valid payment in any other way (§ 8), and all moneys so paid stand on the books of the bank to the credit of the treasurer of the state, and *154 can only be drawn on Ms check, and not even upon his check unless it be drawn upon a warrant issued by one the auditors (§ 9), which indicates whether it belongs to either of the funds aforesaid, and to which.
Upon the books of the bank the lines paid in stand to the credit of the treasurer, just as all other funds or revenues of the commonwealth do which are paid into bank, that is, into the treasury. But upon the books of the second auditor and of the treasurer, fines and other things which are required to be set apart as a literary fund, are debited to the commonwealth to the credit of the literary fund—now the board of education, ¡áo that, whilst; the bank is debtor to the commonwealth for the-whole, the commonwealth is debtor for so much of it as-belongs to the literary fund, to the board of education.
Under the law as it- was when the constitution was framed, and for many years before, and as it now is, fines, when collected in money, would be paid into the public treasury, as other moneys, but would be debited to the commonwealth, to the credit of the literary fund; and thus were set apart as a literary fund. And so if they never reached the treasury, but were paid to the collecting officer in coupons, the’ commonwealth is debited with them to the credit of the.board of education. And it is a matter which does not affect in the slightest manner the rights or interests of the board of education, whether the fines are paid to the commonwealth in-money or in coupons, for in either case the board of education has no claim for the specific thing which the-commonwealth received in satisfaction of the fines, but only to the amount for which the commonwealth chose to become debtor to tbe board.
The fines w-ere due to the commonwealth. It is only those that are due to the commonwealth that are required to be set apart as a literary fund. And they are paid into the treasury, just as all other dues of the common *155 wealth, and are a part of her general revenues until they are set apart for a specific object.
To set apart is not the same as to invest. The general assembly is required to set apart. The board of education has no power to set apart any of the revenues of the commonwealth as a literary fund. So such pow’er is given it by law. It is a power which the legislative department alone is invested with. And the constitution expressly requires the general assembly to set apart fines and certain other revenues of the commonwealth as a literary fund. This cannot, therefore, be done by the board of education. But after they are set apart by the general assembly for the specific object aforesaid, the board is authorized to invest them. By the Code of 1873, chapter 78, § 7, it is authorized and required to invest all the capital and unappropriated income of the literary fund (of course that which has been set apart for it by the general assembly) in certificates of debt of the United States, or certificates of debt of, or guaranteed by this state, or in railroad bonds of a certain description, and may call in any such investments, or any theretofore made, and reinvest them as aforesaid, whenever deemed proper for the preservation, security or improvement of the said fund.
The power, I have said, to set apart fines and other revenues as a permanent literary fund which the board of education is authorized to invest, is vested in the general assembly. The power to set apart carries with it the power to determine in what mode the thing shall be set apart where no particular mode is prescribed in the power. This power has been executed by the general assembly in the regulations which have been made by law for receiving, keeping and disbursing the public revenues, already described. They prescribe the mode by which all revenues of the commonwealth, including fines and the other revenues which the constitution requires *156 the general assembly to set apart as a permanent and perpetual literary fund, shall be paid into the treasury, how they shall be disbursed. Those designated by the seventh section, when they are paid into the treasury, are required to be debited to the commonwealth to the credit 0f the literary fund in both the second auditor’s and treasurer’s offices. This is the mode prescribed by law, by which they are distinguished from the other revenues, and set apart as a literary fund, and the only mode that was ever observed in this state for setting apart a portion of the revenues of the commonwealth for a specific object. It is thus effectually set apart, for it can be disbursed only upon the second auditor’s warrant, and only for the benefit of the literary fund.
These regulations were in force long before, and when the constitution was adopted, and the provisions contained therein requiring certain revenues to be set apart as a literary fund, must be taken as made wfi’th reference to the existing regulations on that subject, and that the terms “ set apart” were used in the sense in which they had always been accepted in this state, and that the framers of the constitution, when they required the general assembly to set apart certain revenues as a permanent literary fund, contemplated that they would be set apart in the mode in which portions of the revenue, including fines, had always been set apart for specific objects, and that they did not thereby intend to overturn and render unconstitutional the whole system which had long been established by law for regulating the receiving, keeping and disbursing the public revenues. I hold that the constitution cannot fairly be so construed, and that the regulations which have been prescribed by law for paying fines and other revenues into the treasury, which were designed to be a permanent literary fund, and for distinguishing them from other revenues in the treasury, and setting them apart as a permanent literary fund, and *157 for disbursing them for the benefit of the literary fund, are valid and constitutional.
Let us now briefly notice its practical working. state collects fines' and other dues of the commonwealth, which the constitution requires the general assembly to set apart as a literary fund. They are paid into the treasury upon the warrant of the second auditor, and are debited to the commonwealth, to the credit of the literary fund, in the offices of both the second auditor and the treasurer. They are thus distinguished and set apart from the other revenues as a literary fund, as we have seen, according to the requirements of the constitution. Afterwards the board of education, by authority of an act of assembly, determines to invest the amount, which is to the credit of the literary fund, in certificates of debt of the United States, or of this state, or in railroad bonds, and applies to the second auditor for a warrant on the treasury for the same. But there is no money in the treasury to pay it. Is it a matter of any consequence to the board how much, or whether any of it was received in money, or how much of it was received by the commonwealth in coupons, since the commonwealth is debited with the whole of it to the credit of the literary fund ? And as there is no money in the treasury to pay it, it would have been no better if all of it had been paid into the treasury in money. So it is obvious that the inability of the treasurer to pay the money to the board is not caused by coupons being receivable in payment of taxes and other dues of the commonwealth. The result would have been the same if coupons had not been so receivable, and the whole had been paid into the treasury in money, but had been disbursed in the payment of interest or other demands on the treasury before the board applied for payment.
Uo matter, therefore, in what medium the state received payment of the fines. By requiring them to be *158 paid into the treasury, and debiting the commonwealth ■ with, the amount as received, to the credit of the literary which we have seen is prohibited by no constitutional inhibition, and by providing for the payment of the annual interest thereon to the schools, she fulfils the requirement of the constitution. Her receiving payment of fines in coupons is consequently no diversion of a fund dedicated to the schools. If she received payment in money it would' be all the same, so far as the literary fund or the schools are concerned; for in either case the state would debit herself with the amount, and the schools or the board of education would have to look to the state for payment, and not to any specific fund. ‘Whether the money received for fines, in common with other revenues, was used in' paying interest on the public debt, or in the payment of governmental expenses, it would not be diverting it from any purpose to which it was dedicated hv the constitution, it having been set apart as a literary fund by the commonwealth, debiting herself with it to the credit of that fund. For if the fines were collected in money and applied to the payment of school quotas, it would be using them for a purpose to which they were not specifically dedicated by the constitution, for only the annual interest was dedicated to that purpose.
But it may be said that the board of education is authorized by law to receive the principal and to invest it; but the constitution does not invest the board with a right to the specific fine, so as to divest the commonwealth of the right to receive it. It is the property of the commonwealth, who alone has the right to collect and to give acquittances and discharges against it. It must he paid to the commonwealth. It must be paid into the public treasury. It must be set apart by an act of the general assembly as a literary fund, and then the law authorizes its investment by the board of education, *159 and after it is so set apart the commonwealth is still the sole owner of it, as she is of all the funds and property of the board of education, and the other which are composed of officers of the government, the funds and property of which are the sole property of the commonwealth. For these reasons the commonwealth’s receiving payment of fines in coupons, and debiting herself ’with them to the credit of the literary fund, is not a diversion of funds dedicated by the constitution to the literary fund, or to the public schools, and is no violation ■of the seventh or eighth sections of article ten of the ■constitution.
But if the foregoing view is erroneous and untenable, ■■and said seventh and eighth sections must be construed :so as to inhibit the general assembly from appropriating ■so much of the revenues of the state as are practicable to be raised to the payment of the interest of the public debt, as shall be necessary for that purpose, by dedicating them to the support of a public school system, which is introduced by said constitution, then the grave question arises, are they not, to that extent, in conflict with the constitution of the United States ? The act making in.terest coupons receivable in payment of all taxes and ■other dues of the commonwealth (not excepting fines) is only an appropriation in advance of so much of the revenues of the state to the payment of the interest, after it is due, as will be necessary for that purpose, in fulfilment of a high constitutional obligation, and if the provisions of the constitution in question are repugnant to that act because it necessarily absorbs in the payment of interest the funds of the commonwealth which are dedicated by said provisions of the constitution, as contended, to the schools, but which are indispensably necessary for the payment of interest, do not those sections of the constitution, as thus construed, obstruct the fulfilment by the *160 state of its solemn obligation to pay the interest it owes its creditors and impair the obligation of her contract ?
Ho one has ever doubted that the state constitution, so far as it does not conflict with the constitution of the United States, is the supreme law to the courts of that state as well as to every other department of the government of that state. But I will not stop to argue so plain a proposition, though it seemed to be contraverted in the argument of learned counsel that if any of its provisions are in conflict with the constitution of the United States, the courts are bound to disregard the former, and to give effect to the latter. Article VI, section 2, of the latter declares; that “this constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties, made, or which shall be made, under the authority of the United States, shall be the supreme law of the land ; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.” And if this constitution has-inhibited what a state has ordained by her constitution, or enacted in the course of ordinary legislation, how can a judge, who has sworn to support the constitution of" the United States with the foregoing clause as part of it, disregard the inhibition and enforce the state law which is inhibited ?
By Article I, section 10, no state “shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts.” And it is well established doctrine that the inhibition extends to the organic law as well as. to ordinary legislation of the state. It was so held by this court, unanimously, in the Homestead cases, and the constitution itself, in the latter part of the clause cited, supra, expressly so provides.
In the face of this inhibition in the constitution of the United States, which Virginia has adopted as her supreme law, was it competent for the framers of her present *161 constitution to assemble in convention, with a just debt resting upon the state, which they acknowledge, and devise and institute a splendid and costly scheme charity, for the education of all the children in the state between the ages of five and twenty-one years, white and colored, and to pledge the resources of the state to its execution in advance, so as to divest the state of the means and the ability, as is claimed it does, of paying the interest she owes her creditors and fulfilling her obligations of pre-existing debt ? Can there be a question in the judgement of a fair minded man, that those provisions of the constitution, as thus construed, would and do impair the obligation of the state’s pre-existing contracts ? That the obligation of the debt was pre-existing appears from the fact that the whole debt embraced in the act of 30th March, 1871, and recognized by that act existed prior to April, 1861, the beginning of the war, and the constitution was framed and submitted to the vote of the people in 1869. And the fact that Virginia, in that settlement, assumed only two-thirds of the debt, with the consent of the creditor, could hardly be relied on to show that for the part of it which she recognized and assumed there was not an existing liability prior to the formation of the present constitution. The fact is, there ivas a pie existing and acknowledged liability on her for the whole debt at the date of the constitution, and it was a legal liability (see Higginbotham v. The Commonwealth, 25 Gratt. 627), from one-third of which she is, in effect, relieved by the settlement in question. But she gave additional security for so much of the original debt as she assumed in the settlement, in the shape of coupons, for the interest receivable in payment of taxes and other dues of the commonwealth. Does that show that there was not a pre-existing obligation on the state, at the date of the constitution, for at *162 least two-thirds of the debt, which is now claimed by the creditors ? As well might it be said that, because a gave a mortgage to secure an old debt, he was under no prior obligation to pay it. But, in fact, at the date of this constitution, there had been no settlement, and the state was legally bound for the whole debt, and had previously acknowledged her obligation by the act of her legislature; and that obligation arose under contracts which antedated the war. If, therefore, the said seventh and eighth sections of the constitution are in effect such as they are claimed to be; if they have pledged the resources of the state, as claimed, which .were necessary to fulfil its pre-existing obligations to its creditors, for the gratuitous education of the children in the state, however desirable it is that they should be educated, those sections, so far as that is their effect, fall within ' the inhibition of the 10th section of Article I of the constitution of the United States, before recited, because they impair the obligation of those contracts. And hence, in my opinion in Antoni v. Wright, concurred in by the court with only one dissenting voice (22 Gratt. 833), in reference to the objection that those provisions of the consti•tution which set apart certain funds and a certain part of the property tax for the public schools, would be defeated by the act in question, I remarked: “It would seem to be a sufficient reply to say that if it were impracticable to raise a sufficient amount of revenue for both purposes, the latter did not impose an obligation on the legislature paramount to the obligation to provide for the payment of the interest on the public debt. That was an obligation antecedent to and paramount to the ■constitution itself, and could not be repudiated by the constitution if it had so provided.”
But if the said constitutional provisions for the institution and support of the public schools have been rightly construed in this opinion, and can be carried out in sub *163 •ordination to the higher obligation of providing for the payment of the principal and interest of the public debt, 'those provisions, so understood, could not impair the obligation of contract, and consequently are not in this ■aspect of the case in conflict with the federal constitution. It is only when they are held to impose obligations on the legislature, or to invest it wdth the right and ■authority to divert the resources of the state from the payment of the public debt, by devoting them in advance to the public schools, and thus to impair the obligation of the. state's contracts, that they can be held to be violative of the constitution of the United States, and void.
There is undoubtedly an obligation imposed on the .general assembly, by sections 7 and 8 of article 10 of the state constitution, to constitute a permanent and perpetual literary fund, and to apply, as may be implied (it is not expressed), the annual interest thereon to the public schools. And the state may prefer to hold the fund herself, aud pay the annual interest on it to the schools, to having it invested in other securities, which would be no infraction of any provision of the constitution. And if there is anything in the provisions of the act of March 30th, 1871, which conflicts with section 7 of chapter 78 of Code of 1873 (supra), which requires the capital and unappropriated income of the literary fund to be invested in a particular way by the board of education, the foi’mer being the more recent act of the assembly, must supersede the latter wrhere there is any such conflict. This is a well established principle. There is also an obligation on the general assembly to provide for the payment of the interest on the public debt. Which is entitled to the precedence? Which is the higher obligation ?
In the opinion already cited, I said: “ This being an obligation of debt, and not eleemosynary in its character, as *164 are the other provisions referred to, and however desirable- and important it may be that they should be carried out,, I hesitate not to say that it is of higher obligation.” But whilst the distinction is recognized, and the higher obligation is conceded, we are told that it is a distinction which it is beyond the province of the court to consider; that the difference is only in morals, and is not recognized by our state constitution, beyond which we cannot look.
In our complex form of government, as we have-seen, the courts are bound to have respect to, and take cognizance of, the federal as well as the state constitution. In fact, to regard the former as the supreme law% which invalidates—renders null and void—any law of the state which impairs the obligation of contract. How, it was claimed in argument, that the state constitution imposes an equal if not higher obligation on the state to-carry out the provisions for the schools. In my opinion it cannot be so regarded, neither in morals nor in law,, in viewr of the relations of the state to the constitution of the United States, which distinguishes between the obligations wm are now considering. "Whilst .it inhibits, a state from passing a law which impairs the obligation of contract, a law in conflict with the provisions made-by the state constitution for the public schools would not fall wdthin the inhibition. The state might, in convention, or in any other mode provided for changing the constitution, abrogate and annul the provisions it contains for the public schools without inhibition from the federal constitution, hut it could make no provision for impairing the obligation to pay its debts. And the reason is because the obligation in the former case is not a contract within the meaning of the 10th section of article 1 of the federal constitution. Consequently, if the revenues which have been set apart for the schools are necessary, in fulfilment of the contracts of the common *165 wealth, to he applied to the payment of the interest on the public debt, so to apply them is not prohibited by the ■constitution of the United States; whilst to set apart by the state constitution, or by an act of the legislature, a portion of the revenues of the state for the schools, or as a literary fund, which are necessary to enable the commonwealth to fulfil her obligations of contract, and without which it would be impracticable for her to fulfil them, would he a plain violation of the federal constitution, because it would he a law of the state which impairs the obligation of contract. Hence the distinction is not only moral but legal, and the consideration of it in this case is clearly within the legitimate province of the court, •and a part of its duty.
For the foregoing reasons, and those stated by Judge Christian, I fully concur in his opinion and in the .judgment of the court.
Burks, J., concurred in the opinion of Christian, J.
The writ awarded.