BOULDIN, J.
delivered the opinion of the court.
This is a writ of error to a judgment of the Circuit court of the city of Richmond, dismissing with costs a petition of the plaintiff in error, filed in said court, to recover a debt alleged to be due to the petitioner from the State of Virginia.
The case was briefly this: — The plaintiff in error, and petitioner below, is executrix of David Higginbotham, deceased, who was owner of twelve shares of stock in the Old James River Company. By an amendment to the charter of that company, passed on the 17th day of February 1820, and duly accepted by the company, the companj--became the agent of the *state to carry on the work on state account, and under the direction and control of the general assembly; and it was agreed between the state and the company that in lieu of the annual dividends which might have been thereafter declared on the stock, the company should be allowed twelve per centum per annum on its stock for twelve years from the commencement of the amendatory act, and fifteen per centum per annum thereafter forever. This act was declared on its face to be “a compact” between this commonwealth and the said company, subject, however, at all times to such change and modification as the legislature may think proper to make: provided, that no such change or modification shall be made as will take from the James River Company their right to the dividends, or any part of the dividends upon their stock *513 allowed to them by this act. Here then we have a solemn “compact” between the state and the company, formally declared to be such on its face, that from and after the commencement of the amendatory act aforesaid, the dividend or annuity, as it is in effect, thereby secured to be paid on each share of stock, should be forever paid without abatement or diminution. Such was the solemn obligation assumed by the state as the price of the stockholders’ property.
By the said act of February 17th, 1820, and by sundry acts passed thereafter, down to the 16th day of March 1832, the powers and duties of the James River Company, acting for the state, were from time to time extended and enlarged; but until the date last mentioned the company itself continued to exist under its own organization. On that day, however, a new company, with greatly extended powers, was chartered, called the James River and Kanawha Company, to which all the interest of the state in the old Janies *River Company was transferred; but this transfer was made expressly “subject to the payment of fifteen per centum per annum forever to the stockholders of the old company. ” By this act the James River and Kanawha Company became the successor of the old James River Company, and the duty of providing forever for the dividend as it is called, of fifteen per centum per annum to the stockholders of the old company devolved, as wre have seen, directly on the James River and Kanawha Company, under its agreement with the state; and by the act of March 22d, 1836, the state required the latter company to pay these dividends into the public treasury, to be disbursed among the stockholders of the old James River Company by the second auditor; thus again solemnly acknowledging the right of the stockholders to these “dividends,” and the duty of the state to see that they were punctually paid, by requiring her assignee to pay them into the public treasurj’ to be disbursed to the stockholders by a state officer.
Such was, in substance, (so far as is necessary to be here considered) the state of legislation on this subject when the act of March 23d 1860 was passed, by which the state became again directly bound to the stockholders of the old James River Company for the “dividends” aforesaid, having assumed the payment thereof in consideration of certain shares of stock in the James River and Kanawha Company, issued by said company to the state. We thus see that in March 1860, the state of Virginia again became directly bound to the stockholders of the old James River Company for an indebtedness, the justice and binding force of which she had often acknowledged, and which forty years before she had herself contracted and agreed to pay as the price of their property granted to her *under a legislative contract which, on its face, is formally declared to be “a compact between the state and the said ■company, ’ ’ and by which the annuity aforesaid is secured to the stockholders without abatement or diminution forever; thus solemnly declaring the obligation of this “compact” on the state should be eternal.
It is unnecessary to discuss the question, whether the nature and original terms of this “compact” and the subsequent dealing of the state with it, add at all to its binding force as a “compact” between the parties. It is enough to say that it is a compact of the state with a portion of her citizens, entered into in terms of unusual solemnity; and that her action down to the close of the late war between the states indicates at all times a careful purpose on her part to preserve intact the rights of the stockholders under it. Accordingly we find that under all the changes of legislation on the subject, down to the first of January 1865, the appellant’s annuity was regularly paid; but since that date there has been but a single payment of $120, leaving arrearages to the amount of $2,220, as of the 1st of July 1871. For that amount with its accruing interest, after applying for payment at the offices of the auditor of public accounts, and the second auditor, and being refused at both, this suit was brought by petition in the Circuit court of the city of Richmond, making the auditor of public accounts and the second auditor parties, and praying judgment against the state for the amount of the claim.
The second auditor made no formal answer to the petition, but there is filed in the cause a certificate from him, showing the arrearages of the annuity or “'dividends,” as he describes them, to be $2,220, as of *the first day of July 1871, being the exact sum demanded by the petitioner.
The auditor of public accounts filed an answer to the petition, resisting payment of the petitioner’s claim on several grounds, all of which will appear in the answer.
The Circuit court held, ! ‘that the plaintiff, at the time of filing her petition in this cause, had a valid and subsisting claim against the state for the arrears of said unpaid dividends, amounting to the sum of twenty-two hundred and twenty dollars ; but the said claim of the plaintiff being for arrears of dividends upon a fixed, ascertained and recognized debt of the state, the time and manner of payment whereof necessarily depend upon considerations, addressing themselves to the wisdom of the general assembly; and by the constitution and the law is reserved for determination to its discretion; and the general assembly not only having failed to make any appropriation out of which either of the auditors could pay the claim of the plaintiff, but having affirmatively declared, that in the present financial condition of the state the said claim cannot be paid, nor any part thereof, except upon terms of compromise and abatement, which the plaintiff declines to accept, the court is further of opinion that it has no authority to grant the prayer of the plaintiff;” and the petition was therefore dismissed with costs.
*514 From this order or judgment an appeal has been taken to this court; on -which the case is now before us.
The questions which have been discussed in this court are in effect the following:
First. Does the state of Virginia now owe the entire debt claimed by appellants?
^Secondly. If she does, can she be sued for it by her own citizen in her own courts?
Unless the affirmative of both propositions can be maintained the judgment of the Circuit court must be affirmed.
The Circuit court held, as we have seen, that the appellant’s claim for the entire debt was a “valid and subsisting claim”; but it has been earnestly contended by the attorney general that the dismemberment of the state of Virginia and the formation of a new state, called West Virginia, out of a portion of her territory, has discharged the state of Virginia from this debt as now claimed; that the old debt of Virginia contracted prior to her dismemberment, if not wholly extinguished by the events leading to, attending and following her dismemberment, is not now due from her but only ratably from the two states.
' Were this a question between the two states alone, I should not question the concluding part of the proposition. My opinion is that justice, public law and common honesty alike require that the old debt of Virginia should be so adjusted between the two states that each shall bear her proper burden. Publicists tell us that “when a kingdom divides by common consent into two or more distinct commonwealths, the public patrimony, with all the debts and incumbrances upon them, ought to be equally shared among them.” Puffendorf, book 8, ch. 12, p. 540.
In the case of Virginia, her partition (whatever the fact may be as to how it was accomplished, about which with honest and candid minds there can be no doubt) seems to have assumed the forms of consent. These forms, however, as already intimated, are not such as to mislead candid and honest minds, but the fact of partition, whether wrongful or not, has been ^acknowledged by both states and must be met as a fact. The principle as to liability for the old debt is the same, however, whether the new state was created by consent or by violence. It is therefore needless now to enquire, by what means the separation was effected. My own opinion is that it was accomplished by act of injustice and spoliation not exceeded in atrocity by the partition of Poland. These are matters, however, to be disposed of by the states inter sese, and are not properly before us as a judicial tribunal adjudicating a mere question of private right. We, as a court, are to deal with the contract before us; to construe its terms; to ascertain its effect, and to decide whether the state of Virginia, as between herself and her creditor, is bound thereby. This is the question for us to decide.
There can be no doubt that prior to the dismemberment of the state she was so-bound. This has been denied by no one, and has been over and again acknowledged by the state herself, not merely by her solemn “compact” aforesaid, and her legislation to secure a faithful compliance with its terms, but also by her punctual payment of the “dividends” or annuity, down to the commencement of the war; by its continued payment after the war, and after the dismemberment of the state, down to the year 1865; by her recognition of the entire old public debt of the state as her debt, as between herself and her creditors in March 1866, by funding all the interest thereon required to be funded by creditors; by a like recognition of the old debt in the 19th section, 10th article of the constitution of the state, and by other legislation. I concur therefore entirely with so much of the opinion of the learned judge of the Circuit court as declares that the appellant “has a valid and subsisting claim” *against the state for the amount of her claim ($2,220); that, as between the state and the creditor, the state still owes this debt and the whole of it.
But I do not think it proper to express this opinion as to the liability of Virginia for the whole of this debt, without saying at the same time, that my opinion is precisely the same as to the liability of West Virginia. She, too, as between herself and the creditor, is bound for the whole debt. A portion of a debtor state may not, in my opinion, by separating herself from the debtor state, and forming a new state (whether by fraud, force or consent), evade the payment of the just debts of the old state, or any part thereof. She cannot thus by her own separate action, or the combined action of herself and the old state, extinguish or even divide the claim of a creditor without his consent. Each of the new states thus formed, so long as they can be identified (even though they may each have assumed a new name), are bound to the creditor for his whole debt. So long then as the identity of the original state may remain, and the new state may be identified as part of the old, both are alike bound to the creditor for the whole debt. Both prior to the partition, owed the same debt under one name; each, after partition, holds portions of the goods and territory formerly bound to the creditor for a common debt, and each is alike bound to pay that debt. “For debts” (as Puffendorf says) “being founded in the commonwealth, not precisely as such commonwealth, but as possessed of certain goods, whoever is master of those, must take the debt with them. ’ ’ Book viii, ch. 12, p. 129. See also Grotius, book ii, ch. 9, $ 9, pp. 340, 41. On the same principle, the publicists agree that when a state is conquered, its nationality extinguished, and its people and territory absorbed by the ^conqueror, the latter is bound for the debts of the former. And Mr. Dana in his edition of Wheaton’s Int. Daw, in a note to § 3D part 1, p. 49 (bottom), *515 says: “In the separation and rearrangements of nations in Europe, special provisions are usually made for the payment of public debts; and the principle seems admitted, that in case of a division of a state, each new state is bound for the whole debt contracted by the former.”
In relation to the formation of a new state, out of two or more states, he announces in effect the same doctrine. He says (same note) : “The formation of the new state so alters the nature of all the securities the creditor looked to, that the new state has a general obligation to see that he does not sutler by the change.”
The principles above announced are just and reasonable in themselves, and are in strict analogy to the well established principles of law applicable to joint debtors. In such cases one debtor may owe the whole debt and the other nothing, as between themselves, but as to the common creditor each owes the entire debt; and no arrangement between themselves, without the creditor’s consent, can sever the debt, or alter it in any respect as to him. Each is and must remain bound for all; and I understand this doctrine to be not only conceded but maintained by the present attorney general. It is, indeed, the only safe and just doctrine for the creditor, and is not at all unjust to the state. By the payment of the whole debt an equity at once arises in her favor to demand contribution from the other state, which she may enforce in the United States courts; a right secured to states but denied to citizens. She cannot suffer therefore by doing right. Virginia has not lost her identity by the loss of forty-eight counties and the inhabitants thereof. ‘Impoverished, crushed and dismembered,” like a multitude of her faithful defenders, “but not dishonored,” she is Virginia still, and so I trust she will long remain. I am wholly unwilling to admit that her identity has been lost. The state of Virginia is still a state. We are told by Mr. Wheaton that if a portion only of a state be separated from the original state by conquest and cession, the original state still continues. Eawrence Wheaton Int. Eaw, part 1, ch. 2, $ 8, p. 32 (6th edi.).
And so with Virginia ; she is still a state. It is true that a portion of her territory and population have been wrested from her; but she yet holds two-thirds of her territory, two-thirds of her population, her capítol, her archives, her traditions, an immense majority of her true-hearted sons and daughters, and her name, with its honored and hallowed memories. “These constitute a sta te ! ”
I am of opinion therefore with the Circuit court, that the state of Virginia i's bound by her “compact” with her creditor for, and now owes the entire amount of the debt claimed in the petition, not only because she holds a large proportion of the goods and territory of the old state of Virginia, but because she is old Virginia herself. Her identity has never been lost.
It is scarcely necessary to add that in what has been said above it has not been my purpose to express or intimate any opinion as to the respective rights and liabilities of the state and those of her creditors who have accepted the provisions of the act of March 30th, 1871, commonly ca lied the funding act. That question is not before us, even incidentally, and no opinion is expressed thereon.
On the second question involved in the cause, I am constrained to differ in toto with the Circuit *court. I do not consider that the failure or refusal of the legislature to make provision for the payment of the appellant’s claim, or the fact that the claim itself was for an acknowledged and liquidated debt, either, or both combined, constituted a sufficient reason for dismissing the appellant’s petition. On the contrary, my opinion is that under the statutes of the state, she is liable to be sued in this case by petition against the auditor, and that judgment should have been rendered against her. I do not mean to intimate that a state can be sued in any case either by her own citizens or others, in her own courts, without her authority and against her consent. But it has ever been the cherished policy of Virginia to allow to her citizens and others the largest liberty of suit against herself; and there never has been a moment since October 1778 (but two years and three months after she became an independent state), that all persons have not enjoyed this right by express statute.
By the fifth section of the act of October 1778, 9 Hen. Stat., p. 540, it was enacted, that where the auditors, acting according to their discretion and judgment, shall disallow or abate any article of demand against the commonwealth, and any person shall think himself aggrieved thereby, he shall be at liberty to petition the high court of chancery, or the general court, according to the nature of his case, for redress, and such court shall proceed to do right thereon; and a like petition shall be allowed in all other cases to any other person who is entitled to demand against the commonwealth any right in law or equity.”
Here then is the largest liberty of suit against the commonwealth which can well be conceived. It is allowed not only to all those persons whose claims may *have been presented to the auditors according to law, and refused by them, but to all others ‘ ‘entitled to demand against the commonwealth any right in law or equity.” I can conceive of no class of claimants not embraced by this law; and the privilege has never been taken away or curtailed by any subsequent statute. It will be found re-enacted in the revisal of 1819, with scarcely the change of a word. 2 Rev. Co. 1819, ch. 174, $ 6, p. 2. And by the act of March 20th, 1838, entitled “an act concerning claims against the commonwealth,” Sess. Acts 1838, ch. 14, p. 27, the same unlimited right of suit against the commonwealth is secured to all persons, in *516 language more in detail, but not more comprehensive than that alreadj^ on the statute book. A portion of the first section of the act enacts “that it shall be lawful for all persons having' claims against the commonwealth, legal or equitable, and whether the amount be liquidated or not, to present them to the auditor, and if the same be not allowed, to proceed according to the sixth section of the “act to reduce into one the several acts concerning the auditor and treasurer, ’ ’ which has been above referred to. And so the law remained until the revisal of 1849.
In their report to the legislature, the re-visors recommended the adoption of a clause, the same in substance with the law then in force, and retaining the words “legal or equitable, and whether the same be liquidated or not;” but the committee on revision, and the legislature with a view to brevity, struck out those words as mere surplusage, and embraced the same idea in a more concise form, by using the words “any other claim” against the commonwealth. And so the law now stands. No language can be broader and more comprehensive ; and I can see no reason for ^confining this general and unlimited authority to sue the commonwealth on any other claim to unliquidated claims alone.
To attain that result it will be necessary to interpolate a word which will alter the entire meaning of the sentence, viz, the word “unliquidated” before the word “claim,” so as to make it read “any other unliquidated claim,” instead of “any other claim.” I see no justification for taking this liberty with the statute, especially when we consider that it would impose a restriction on her creditors at war with the time-honored usage and legislation of the state, with her established policy from the very dawn of her independence. That policy is and has been to allow to the citizens the same use of her courts against herself which she has against the citizen; the largest liberty of suit.
Some stress has been laid in the argument on the fact that under the law as it now stands, claims which, if allowed, would be chargeable to the literary fund, the fund for internal improvements, &c., &c., are excepted from those to be presented to the auditor of public accounts before suit thereon, and it is argued that the exception shows that the state did not design to be sued on that class of claims of which the petitioner’s is one. A moment’s reflection will show the fallacy of the argument. For more than forty years there was but one auditor’s office in the state, filled first by a plurality of persons and afterwards by one alone. So long as this state of things continued, all claims required by law to be audited were presented to the auditors or auditor as the case might be; and during that entire period no such exception as is now referred to appeared in our legislation. But in the course of time it was deemed expedient by the legislature *to establish a second auditor’s office, and to give to the second auditor charge and control of the particular funds, &c., mentioned in the exception we are considering; and in perfect harmony with his control of those funds, and to facilitate it, it was further enacted that claims which if allowed would be chargeable to those funds should be audited by the second auditor, and not the auditor of public accounts. This legislation rendered the exception under consideration absolutelj"- necessary to harmonize the acts and prevent a conflict of duty between the respective auditors. It imposed no restriction whatever on the unlimited right of suit granted the citizen. Whenever the claim, whatever might be its character, shall have been presented to the proper officer and disallowed then the only redress left the holder is a suit against the auditor of public accounts, as allowed by law.
Were this a suit upon a state bond, for the principal of the debt, there might, perhaps, be some reason to sustain the view of the Circuit court. These bonds, I think, for I have not one before me, generally, if not always, provide on their face that the principal of the debt is irredeemable for a fixed number of years, and at the expiration thereof redeemable at the pleasure of the general assembly. On such bond it might perhaps be' well argued that there could be no suit for the principal without special license from the state, because, on the face of the bond,' she has provided that it is payable only at her pleasure. But I do not mean to express an opinion on that question, as the case is not before us. This is not such bonded debt; nor is it for the proceeds or accretions of such a debt, or of any established and liquidated liability, paj'able at uncertain and indefinite periods; nor is it for “dividends, ” *properly so called. It is in fact a claim, which, before the last assumption thereof by the state, was payable, and had been paid at stated intervals by a party liable to suit for a failure, and which the state, on assuming the same, must be held bound to pay at the same periods. The question then is, whether the state being bound by her compact to pay this annuity at the times indicated, “forever,” can be sued for failing and refusing to comply with her contract? My opinion is that she can; and that the unrestricted right to sue her in any such case has existed for very nearly a century. I am of opinion therefore, that the judgment of the Circuit court, dismissing the appellant’s petition with costs, should be reversed and annulled, and that judgment should be entered for the petitioner for the amount of her demand with interest.
In so deciding, no power is claimed for this court to control, or in any manner to interfere with the discretion of the legislature in making provision for the payment of this debt. The court can only decide that the debt claimed is just and due, and ought to be paid; that the state has consented to be sued for it; and that judgment should be rendered against her as a matter *517 of course. The judgment being for more than three hundred dollars, the court has no authority to require the auditor of public accounts to issue his warrant for the amount. In such cases, the provision to be made for the judgment is expressly reserved to legislative discretion, and to that discretion we must leave it.
Moncure, P. being interested did not sit in the case; but expressed his hearty concurrence in the opinion.
Decree reversed.