# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## GREENHOW, TREASURER, V. VASHON.

### JANUARY 14, 1886.

1. CONSTITUTION—*Coupons—Public free schools.*—Section two of act of assembly, approved March 15, 1884, providing for a separate assessment of taxes for the support of the public free schools, and section 113 of the same act, providing that such taxes shall be paid and collected only in lawful money of the United States, are not repugnant to section eight of Article VIII of the State constitution, but were enacted in obedience to its positive mandate; and such taxes cannot be paid in the State's tax-receivable coupons. Acts 1883–84, pp. 561, 603.

2. IDEM.—*Antoni* v. *Wright,* 22 Gratt. 833, and *Antoni* v. *Greenhow,* 107 U. S. 771, examined and distinguished from the case at bar.

Error to judgment of hustings court of city of Richmond, rendered 1885, on a petition by George S. Vashon, a taxpayer in said city, to obtain from the said court a writ of *mandamus* to compel S. C. Greenhow, treasurer of said city, to receive of him (Vashon) coupons cut from bonds of the State of Virginia, issued under the act approved March 31, 1871, in payment of the State taxes for which said Vashon was indebted for the year 1884. Greenhow demurred to Vashon's petition, and then answered, setting forth his reasons for refusing to receive said coupons. The hustings court sustained the demurrer, and there being no dispute about the facts, issued a peremptory *mandamus* as aforesaid.

Opinion states the case.

*Attorney-General F. S. Blair* and *W. R. Meredith,* for the plaintiff in error.

*R. L. Maury,* and *Sands & Bryan,* for the defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The defendant in error, George S. Vashon, a tax-payer in the city of Richmond, being indebted to the State of Virginia for State taxes, for the year 1884, to the amount of $35.63, on the 12th day of November of that year tendered to S. C. Greenhow, the treasurer of said city, and the officer appointed by law to receive said tax, in payment thereof, certain coupons, cut from bonds of the State of Virginia, issued under the act of the general assembly, approved March 31, 1871, entitled, "An act to provide for the funding and payment of the public debt," one for one thousand dollars, No. 3174, and one for one hundred dollars, No. 1279; said coupons being of the denomination of $30.00 and of $3.00, which coupons were then past due according to the stipulated time of payment mentioned on the face thereof. At the same time the said Vashon offered to pay said treasurer said tax in legal tender notes and coin, and demanded that said treasurer receive said coupons, along with said legal tender notes and coin, for the purpose of identification and verification in manner and form as required by an act of the general assembly, approved January 14th, 1882, entitled, "An act to prevent frauds upon the Commonwealth and holders of her securities in the collection and disbursement of revenue."

The treasurer offered to accept the money in discharge of said taxes, but refused to accept the coupons, and particularly so much thereof as were offered in payment of such portion of said taxes as was set apart by the constitution and laws of this

State for the support and maintenance of the public free schools of this Commonwealth. But Vashon refused to pay in money unless the coupons were accepted and forwarded by the said treasurer to said hustings court for verification as afore-said; and thereupon obtained from said court a rule *nisi* against said treasurer, requring 'him to appear and show cause, if any he could, why a *mandamus* should not issue compelling him to receive the coupons tendered as aforesaid. The treasu-rer demurred to Vashon's petition, but the court overruled the demurrer, and he then answered, setting forth his reasons for refusing to receive said coupons—which answer is as follows:

1. " That the constitution of Virginia provides in section 7, Article VIII, what specific sums shall be set apart as a per-manent and perpetual literary fund, and includes such other sums as the general assembly may appropriate.

2d. "That section 8, of same article, provides that the gen-eral assembly shall apply the annual interest on the literary fund and an annual tax on the property of the State of not less than one mill nor more than five mills on the dollar for the benefit of the public free schools.

3d. " That in pursuance of this constitutional authority the general assembly has provided in acts of 1883–'84, p. 561, that on tracts of land and lots a tax of ten cents on every hundred dollars of the assessed value thereof shall be levied, which shall be applied to the support of the public free schools of the State.

4th. " Again, the last general assembly, in acts of 1883–'84, p. 683, has provided that all taxes assessed on property—real or personal—and dedicated to the maintenance of the public free schools of the State, shall be paid and collected only in lawful money of the United States, and shall be paid into the treasury to the credit of the free school fund, and shall be used for no other purpose whatsoever."

And the respondent averred that to have forwarded such of the coupons as were offered in payment of the tax dedicated to the public free schools would have been a violation of the constitution and laws above referred to.

To this answer the petitioner, Vashon, demurred, and the treasurer joined therein, and there being no controversy as to the facts at the hearing, the said hustings court sustained the demurrer, and awarded a peremptory *mandamus* requiring the said treasurer to receive the money mentioned in the petition—to-wit, $35.63, in payment of the taxes, together with the coupons mentioned therein, and to forward the coupons to the court for verification according to law.

The ticket for the taxes against Vashon represented that there was due the Commonwealth from him for the year 1884 on certain lots in said city "government tax" to the amount of $25.97, and "school tax" to the amount of $9.66—total, $35.66 ; which separation and specification was made pursuant to section 113, chapter 450, Acts 1883–'84, p. 603.   The coupons tendered as aforesaid are, on their face, made "receivable at and after maturity for all taxes, debts, and demands due the State."

On the application of the respondent, Greenhow, treasurer, a writ of error and *supersedeas* to said judgment was awarded by one of the judges of this court.

The precise question here involved has never before been presented to this court for determination.   The decision in *Antoni* v. *Wright*, 22 Gratt. 833, though perhaps expressed in terms sufficiently broad to have done so, did not, however, embrace it, as the matter there adjudicated differed from the matter here to be passed upon, in that the latter depends upon specific provisions of our State constitution and legislative enactments made in pursuance thereof, whilst the former rests for the most part on general principles.   The question here

involved, briefly stated, is this: Do the matters set up in the respondent's answer constitute a sufficient defence in law for his refusal to accept the coupons tendered to him by the tax-payer, Vashon, and particularly so much of said coupons as were tendered in payment of such portion of the tax as had been set apart by law for the support of the public free schools of the Commonwealth? And the question thus stated is pregnant with another of vast importance to the people of this Commonwealth, and that is: Are sections 2 and 113 of chapter 450, of the acts of the general assembly of 1883–84, pp. 561 and 603, constitutional and valid?

Obviously, the questions thus presented make it incumbent upon this court to inquire into, though not to pass upon, the constitutionality and validity of the act of the general assembly of March 30, 1871, commonly known as the funding bill. And in doing this it becomes necessary to review the doctrine laid down in the majority opinion in *Antoni* v. *Wright, supra,* decided by this court in 1872. In his opinion in that case, Bouldin, J., speaking for the majority of the court, after stating the questions involved, starts out with this remark: "The first and all-essential question is, Was there a valid contract between the State and her bondholders?" The question in *Antoni* v. *Wright* arose on the act of March 7, 1872, which, in effect, repealed that feature of the funding act of March 30, 1871, which made coupons "receivable at and after maturity for all taxes, debts, and demands due the State."

Proceeding to answer the question propounded by himself, (was there, by virtue of the funding act of 1871, a valid con-tract between the State and her bondholders), Judge Bouldin calls attention to the fact that, prior to the dismemberment of this State, she had contracted a debt which, at the time of the passage of the funding act in 1871, amounted to some $40,000,000 of principal; that during the war, and by an act

of violence the State was powerless to resist, about one-third of her territory and population was cut off and formed into the State of West Virginia ; and that the State of West Virginia, so formed and constituted, had been admitted a member of the Federal Union ; that both States in their constitutions and by legislation, had acknowledged their respective liability for a just and equitable proportion of the old debt; and that efforts had been made from time to time to adjust that liability, but that very little progress towards a settlement had been made. " In the meantime" (says the same judge) "the payment of interest on the debt was, for a time, wholly suspended, and afterwards only partially resumed by the State of Virginia alone; whilst West Virginia had not, and has not to this day, paid any part of the debt, principal or interest ; and the entire debt standing in the name of the State of Virginia, and her bonds being held for the whole amount, much anxiety was felt and manifested on the subject, as well by the State as by her creditors."

He then proceeds: "Under the circumstances, and hopeless of an early settlement with West Virginia, the State of Virginia proposed to her creditors, by the act aforesaid of the 30th of March, 1871, a separate adjustment of what she deemed her own indebtedness—which she *assumed* (italics ours) to be two-thirds of the entire debt. Her object, as declared in the pre-amble to the act, was 'to enable the State of West Virginia to settle her proportion of said debt with the holders thereof, and to prevent any complications or difficulties which might be interposed to any other manner of settlement; and for the purpose of promptly restoring the credit of Virginia, by *pro-viding for the prompt and certain payment of the interest upon her proportion of said debt, as the same shall become due';* and her offer was to issue to her creditors new bonds for two-thirds of the entire debt, principal and interest, to run for thirty-four

years, with interest payable semi-annually on the aggregate amount of principal and interest, the bonds to be *coupon* or registered at the option of the creditor, and to be convertible the one into the other at like option; and to secure 'the prompt and certain payment of the interest as the same shall fall due,' and, to give the *coupons* greater value, they were to be 'renewable, at and after maturity, for all taxes, debts and demands due the State,' which should be so expressed on their face."   As to the remaining third, *assumed* to be the just proportion of West Virginia, Judge Bouldin refers to the certificate to be issued therefor by the State of Virginia to all creditors who should accept the terms proposed by the State in said act of March 30th, 1871.

These things Judge Bouldin refers to as matters of history; and from them he deduces the essential element in every contract—a valuable consideration.   That there was no valuable consideration moving from the holders of the State's bonds, who accepted the terms thus proposed, not by the State (for her constitution forbade any such proposal), but by the legislature, without any authority to do so, is manifest from the matters of history and the very terms of the act relied on by the learned judge to sustain his conclusion that, as to all those who accepted the terms of the act, it was a valid contract founded on a valuable consideration.   In a dissenting opinion of great ability and clearness delivered in that case by Staples, J., the want of any benefit to the State from the funding bill of 30th March, 1871, is made so unanswerably clear that "he who runs may read."   He says: "In the present case, if the State will derive any benefit from the funding bill—if that enactment is founded upon a valuable consideration—I am unable to perceive it.   It is said that the creditor has released one-third of his debt.   I do not so understand it, and I will hazard the assertion the creditor does not so construe the law.

If this was the intention of the framers of the act, they have adopted an obscure and equivocal mode of expressing a plain and simple agreement. The creditor surrenders his bond and obtains a new one for two-thirds of his debt, and coupons for the interest. For the remaining third the bond is held in trust by the State, and a certificate is given him stating that payment will be provided for in accordance with such settlement as may be made with West Virginia. If that State is faithful to the obligations resting upon her, the creditor will receive the other third also. On the other hand, if she repudiates these obligations, there is no agreement or understanding absolving the State from the payment of such third. It is as much bound for the payment of the whole debt as before the passage of the funding bill." (This court has since so held in the case of *Higginbotham* v. *The Commonwealth*, 25 Gratt. 627.) "I am, therefore, unable to perceive that the State has derived any advantage from the creditors' acceptance of the provisions of the funding act. The contract, if such it be, is wanting in the essential element of a valuable consideration, so much relied on in the opinion of the Supreme Court of the United States." (Referring to *Freeman* v. *Nichols.*)

It is absolutely impossible to read the terms of the funding bill and the form of certificate issued thereunder, (which is set forth at large in the opinion of Judge Bouldin), and fail to see and be convinced of the unanswerable position taken by Judge Staples in his dissenting opinion.

Nothing ever claimed to rest on the ground of legal and valid contract, could well fall further short of its aim than does the funding bill, even when backed up with the creditors' acceptance of its terms. So far from being or proposing a contract in legal contemplation, it undertakes to make an unqualified surrender of the right of the State to control her revenues, and this for thirty-four years, regardless of the exi-

gencies and pressing needs of the State that may arise in the meantime.

The funding bill rests solely on *assumptions*. It assumes that, by the dismemberment of the State of Virginia, she lost one-third of her territory and population, and that West Virginia is, therefore, bound for one-third of the old debt. The liability thus assumed to rest upon West Virginia has, by that State, been treated (and this, too, is part of history) more as an idle joke (we are sorry to say) than in the spirit of justice and mutual obligation between sister States. Upon the same basis it is *assumed* that this State's proportion of the debt is only two-thirds thereof, and the funding bill proposes, not an exoneration from liability for the other third, but, in effect, proposes terms—ruinous terms—for the settlement of the two-thirds, and postponement of settlement as to the other third. May the evil day never come to Virginia when that other third shall be demanded under terms so ruinous and humiliating to her people!

In his opinion, Judge Bouldin uses language from which the conclusion would seem necessarily to follow, that there is and can be no inviolable contract feature connected with the funding bill. He says: "It is unquestionably true that one legislature cannot, by an act of ordinary legislation, bind or control, in any manner, subsequent legislatures. Such acts of legislation are, and of right should be, always subject to amendment or repeal." But, he contends, it is equally true that by special legislation, amounting to a contract, a subsequent legislature may be bound; and he cites numerous instances, which no one will controvert. The vice, it seems to us, in Judge Bouldin's argument is, that it rests upon the unwarranted assumption of a valid contract, when the essential element of a valuable consideration is palpably wanting. But that learned judge concedes it to be unquestionably true that one

legislature cannot, by an act of ordinary legislation, bind or control subsequent legislatures. This being so, we ask, what possible subject belongs more certainly to *ordinary* legislation, than the laying of revenue and providing for its collection and how it shall be applied? And is it not obvious that any legislative act which deprives future legislatures of this all-important right, must, in the nature of things, disarm and degrade the State? It would seem that argument ought to be unnecessary to repel an idea so repugnant to all our ideas of legitimate legislative authority.

But to sustain this alleged contract feature of the funding bill, authorities are appealed to. Those mostly, if not entirely, relied on are *State of New Jersey* v. *Wilson*, 7 Cranch, 154; *Woodruff* v. *Trapnell*, 10 How. U. S. 190; and *Freeman* v. *Nichols*, 8 Wall. U. S. 44.

In the first named case the arrangement claimed to be a contract was a stipulation by the legislature of the then colony of New Jersey, in a grant of land to the Indians within the colony, that the lands granted should be forever exempt from taxation. In the year 1804—more than fifty years after the date of the grant, when the colony had become a State of the American Union, and after the Indians had sold their lands and left the State—an act was passed by the legislature of New Jersey repealing the exemption clause in the grant; and a question arose between an owner of a portion of these lands and the State of New Jersey as to the validity of the act of repeal.

The Supreme Court of the United States held that the grant to the Indians was a valid contract, founded on a valuable consideration, and that the act of repeal impaired the contract, and was void. There the consideration for the contract clearly appeared. The Indians had large claims to land in the colony of New Jersey. These claims they relinquished

VOL. LXXXI—44

and made a deed of cession to the colony, taking in considera-
tion thereof the grant of land aforesaid.    No argument can
be necessary to show the wide distinction between that case,
where every element essential to a valid contract was present,
and the funding bill of 1871, where the essential element of a
valuable consideration is, in every sense, absolutely wanting.

The other authorities relied on by the majority in *Antoni* v.
*Wright*, are ably commented on by Judge Staples in his dis-
senting opinion, and he clearly demonstrates that they do not
apply, and do not sustain the views of the majority of the court
in that case.    As to all of them, it may here be said also, that
it is not pretended that there was in the constitutions of the
States respectively in which those controversies arose, any pro-
vision which the respective legislative provisions conflicted
with.    Here there are specific constitutional provisions with
which the funding bill of 1871 is in conflict.    This view will
be further elaborated in discussing the precise questions pre-
sented by the record in this case.    In connection with what
has been already said, a further brief review of *Antoni* v. *Wright*
will demonstrate that the questions here presented are not
concluded in and settled by the rulings of this court in that
case; nor, indeed, by the subsequent decisions of this court to
the same effect, nor by the Virginia coupon cases, decided by
the Supreme Court of the United States.

The funding bill, with the *coupon* feature attachment, was
passed on the 30th of March, 1871.    Under that act many
bonds were issued with coupons, which, on their face, were
made "receivable at and after maturity, for *all* taxes, debts,
and demands due the State."    The general assembly, however,
on the 7th of March, 1872, passed another act prohibiting the
officers, charged by law with the collection of taxes, from
receiving in payment anything else than gold and silver coin,
United States treasury notes and notes of the national banks,

and repealing all other acts inconsistent therewith. In November, 1872, *Antoni* v. *Wright* was decided, in which it was held by this court that in issuing those bonds, the State entered into a valid contract with all persons taking the coupons to receive them in payment of all taxes and State dues, and that the act of 1872, so far as it conflicted with this contract, was void. The taxes and dues there referred to might *possibly* be construed to mean the taxes ordinarily levied for the support of the government, and not certain specific taxes which the State constitution specially commanded the legislature to levy on certain subjects therein particularly designated, and to collect and set apart them, and sums derived from other named sources, and apply them exclusively to the support of the public free schools of the State. It is certain that by no other possible construction can the decision be defended as, in any sense, consistent with the organic law of the State, or can the opinion of the court be held to be in harmony with that decision. Bouldin, J., delivering the majority opinion, on p. 848, after conceding, as before remarked, that in matters of *ordinary* legislation one legislature cannot bind subsequent legislatures, and that such acts of legislation are, and of right ought to be, always subject to amendment and repeal, says: "But it is equally true that by special legislation amounting to a contract, a subsequent legislature may be bound. It is bound irrevocably by a legislative grant; by a temporary or perpetual exemption of specific property from taxation; by a bond issued by the State for money loaned or other sufficient consideration; by charters of incorporation without reservations, and by all *legitimate* legislative contracts." And again, on p. 854, in answer to the objection that the contract was repugnant to section 8, Article VIII, of our State constitution, the same learned judge said: "We think there is no such conflict in the case. The interest on the debt funded may be

paid in the mode prescribed, and the constitutional provision
in relation to the schools respected and complied with." In
reply to this Staples, J., referring to said section 8, on p. 861,
said: "The money derived from the sources in that section
alluded to, is a trust fund, and the legislature is made a trustee
for its inviolable application to the promotion of the cause of
education, and that body is absolutely prohibited from appro-
priating it to any other purpose, as any other trustee is
restrained from applying a trust fund to his individual debts.
It is said that the obligation to pay the public debt is as strong
and sacred under the constitution as that of providing for the
support of the public schools. That may be so, still it does
not follow that revenues dedicated by the constitution to one
object exclusively, can be applied to another." And, on p.
862, the same learned judge said: "It can hardly be neces-
sary to adduce argument or authority to show that no valid
contract can be founded on a law which violates the constitu-
tion of a State." This palpable truth is conceded in the opin-
ion of the majority of the court as the contention there is,
only that "a subsequent legislature is bound by all *legitimate*
legislative contracts."

In making these extracts from these clashing opinions, the
object is by contrasting them to bring into clearer light, not
only their points of disagreement, but also those in which they
agree. It is obvious that the majority of the court did not
deny the constitutional obligation of the legislature to provide
for the schools, though it did contend that the arrangement
made for the payment of the interest on the funded debt con-
stituted a valid contract that was irrepealable by subsequent
legislation, and yet insisted that the arrangement did not con-
flict with section 8, Article VIII, doubtless, especially as there
had at that time been no law passed levying the specific taxes
provided for by that section, and setting the revenues there-
from derived, apart for, and applying the same, to the schools.

On page 855 Bouldin, J., says: " The obligation to provide for the interest due by the coupons is as high as the duty of applying the capitation tax and other funds to the schools. Both duties are alike obligatory, and both may be discharged, as there is no conflict between them." At this point it may be interpolated that the State constitution, section 8, Article X, directs the legislature to provide a sinking fund for the payment of the *principal* of the public debt, but makes no direction as to the payment of the interest, and in that respect differs from the former constitution ; whilst its mandate, that the legislature shall dedicate certain revenues to the schools, is singularly specific ; and in view of this difference it is not easy to see how the two obligations can be equal, the one being clearly self-imposed by the legislative contract, and the other being imposed by the constitution. But returning to the point digressed from, one of the grounds on which the dissenting judge deemed the alleged contract unconstitutional, was that the coupons *might* absorb the entire revenue, as well that alluded to in section 8, Article VIII, as any other, and leave the schools destitute of support. Such apprehension was well founded, as the legislature had not then taken any steps in obedience to the constitution to discriminate the school taxes from those levied for the support of the government. The revenues were assessed, collected, paid into the treasury of the State, and kept as a whole without any separation or specification as to how it should be applied, and there was no way of discriminating between those designed for ordinary governmental purposes, and those which the legislature should have set apart for and applied to the support of the public free schools. Under such circumstances, of course, all were more likely to be absorbed by the tax-receivable coupons. This could not have been the case had section 8, Article VIII, been self-executing. From the nature of things, it was not self-

executing. It required legislation providing for separate assessments, collections and application of the school tax; in a word, to render the constitutional provision practically available for the purposes for which it was intended. For some unaccountable reason, or from mere inadvertence, the legislature had neglected passing a law carrying out this provision. In *Clark* v. *Tyler*, 30 Gratt. 134, where this court decided that fines imposed for violations of law were embraced in the funding act of 1871, and were dischargeable with overdue coupons cut from bonds issued under that act, Staples, J., consistently with his views in *Antoni* v. *Wright*, again dissented, and in his opinion referred to the fact that fines were still paid into the treasury indiscriminately with other public dues, and emphatically suggested that the legislature ought long ago to have passed a law carrying into effect said constitutional provision, and setting apart the fines for school purposes; and such continued to be the *status* when *Williamson* v. *Massey*, 33 Gratt. 237, was decided in 1880. At length, awakened to a sense of its plain, imperative duty in that regard, the legislature did, on the 15th of March, 1884, pass the act referred to in the answer of Treasurer Greenhow, the plaintiff in error here, (see Acts 1883–84, chapter 450, section 2, page 561), which reads: "On tracts of land and lots, and the improvements thereon, not exempt from taxation, there shall be a tax of thirty cents on every hundred dollars of the assessed value thereof, which shall be applied to the support of the government, and a further tax of ten cents on every hundred dollars of the assessed value thereof, which shall be applied to the support of the public free schools of the State." And section 113, page 603, reads: "All taxes assessed on property, real or personal, by this act and dedicated by it to the maintenance of the public free schools of the State, shall be paid and collected only in the lawful money of the United

States, and shall be paid into the treasury to the credit of the free school fund, and shall be used for no other purpose whatever. And to this end, the auditor of public accounts shall have the books of the commissioners of the revenue prepared with reference to the separate assessment and collection of said school tax, and the several treasurers of the Commonwealth shall have the tax bills in their counties and corporations so made out as to specify the amount of the tax due from each tax-payer to the public free school fund, including the capitation tax, of whatever kind or nature, and to keep said capitation tax and school taxes separate and distinct from all other taxes or revenues so collected by him, and forward the same thus separate and distinct, to the auditor of public accounts, which shall be kept separate and distinct by him from all other taxes or revenues until paid to the public free schools."

Now, the matter set up in the treasurer's answer is sufficient in law to justify his refusal to receive so much of the coupons tendered him by Vashon, the tax-payer and defendant in error here, as was intended as payment of that portion of the tax that was dedicated to the support of the public free schools, provided that said sections 2 and 113 are in accordance with the duty imposed and the authority conferred on the legislature by said section 8, Article VIII, of our State constitution.

The simple question, then, is, as to the consistency of those sections of the act of the 15th of March, 1884, with the aforesaid provisions of the constitution. But that consistency is a thing so plain that there is not the least tendency to obscurity, except by a multiplication of words. It goes without saying ; it speaks for itself; it is plain to the naked eye of common sense; there can be no two opinions about it; the enactment of those two sections was not only warranted, but was positively commanded by that highest authority for legislation, the organic law of the State, section 8 of Article VIII, which

reads: "The general assembly shall apply the annual interest on the literary fund, the capitation tax provided for by this constitution for public free school purposes, and an annual tax upon the property of the State of not less than one mill nor more than five mills on the dollar, for the equal benefit of all the people of the State, the number of children between the ages of five and twenty-one years in each public free school district being the basis of such division."

Section 7 of said Article VIII prescribes what sources of revenue the legislature shall set apart as the literary fund. And section 5, Article X of the constitution authorizes the general assembly to levy a capitation tax not exceeding one dollar on every male citizen twenty-one years or more of age, which shall be applied exclusively in aid of the public free schools.

Our constitution, with these provisions in it, was adopted by the people of Virginia on the 6th of July, 1869. We were then undergoing the severe ordeal of reconstruction. Conditions were imposed, one of which was that our restoration, so-called, to the sisterhood of States should depend upon the approval by Congress of our constitution. It was adopted by our people, submitted to and approved by the Federal Congress with said provisions in it; and thus we were restored to membership in the Union. Can it be that any power, Federal or State, would permit, much less encourage, its violation? Is it not our most sacred duty to preserve it inviolate? This constitution was in force when the funding act of March 30, 1871, and when the act of March 15, 1884, were passed. We have seen that the act of March 15, 1884, was, in terms, directed by the constitution. The funding act of 1871 was not, in terms, so directed— the only constitutional provision for the payment of the public debt being, as before stated, that which directs the creation of a sinking fund for the payment only of the principal of the public debt.

If the funding act of March 30th, 1871, can, by possibility, be held constitutional, it can be on no other ground than that it is not in conflict—as this court, in *Antoni* v. *Wright*, said it was not—with section 8, Article VIII, of our State constitution, which plainly directs the act of March 15th, 1884, under which this controversy arose. How it is possible to hold that the conflict does not exist between the funding act of 1871 and said section 8 of Article VIII, of the State constitution, we are unable to discover. When the funding act was passed it was the law of this State—the fundamental law—that the specific taxes alluded to in section 8, Article VIII, of the constitution should be dedicated and set apart for the support of the public free schools, and, by a well established principle, such provision was as much a part of the contract arising out of the act, and as completely binds the coupon-holder, as if that law were engraved on the face of every coupon. *Hayward* v. *McCracken*, 2 How. U. S. 613, and authorities there cited. And the holder takes the coupon, just as a purchaser takes what he buys, subject to all liens and charges of which he had actual or constructive notice.

It is, however, unnecessary to prolong the consideration of these questions. Aside from the question whether the funding act of 1871 is in conflict with the constitution, and therefore void to the extent that the coupons attached to the bonds issued under that act were made "receivable for all taxes, debts and demands due the State," it is clear that the precise question presented by the record in this case was not before this court in *Antoni* v. *Wright*, or in any of the similar cases subsequently decided. Nor was there any such question before the Supreme Court of the United States in any of the Virginia coupon cases that have been decided by that tribunal. This fact makes the situation much less embarrassing than otherwise it would be. And in intimating our opinion as to the constitutionality and

validity of the funding act of 1871, (but not deciding that question), we have been induced to do so in order to make easy and clear the solution of the question here presented.

We have seen that the act of March 15th, 1884—the act here in question—makes the specific taxes for the support of the schools payable only in the lawful money of the United States; and it has been said (not decided) in *Antoni* v. *Greenhow*, 107 U. S. 771, that "any act which forbids the receipt of these coupons for taxes is a violation of the contract, and void as against the coupon holders." This, we take it, was merely said as to the general effect of the previous decisions of this court and of the Federal court. The act here under consideration was not in contemplation, for it was not in existence. And that decision must necessarily be limited to the taxes ordinarily levied for the support of government. So limited, it does not effect the question here.

We are of opinion that the said act of the 15th of March, 1884, was not only necessary and proper, but was passed in obedience to a positive mandate of the constitution, and is valid; and that the judgment of the hustings court complained of is erroneous and must be reversed.

LEWIS, P., dissented.

JUDGMENT REVERSED.